701 So.2d 593 (1997)
William DeFREITAS, III, Appellant,
v.
STATE of Florida, Appellee.
No. 95-3976.
District Court of Appeal of Florida, Fourth District.
October 22, 1997.
*594 Bruce S. Rogow and Beverly Pohl of Bruce S. Rogow, P.A., Fort Lauderdale, for appellant.
Robert A. Butterworth, Attorney General, Tallahassee, and Melynda L. Melear, Assistant Attorney General, West Palm Beach, for appellee.
BAKER, MOSES, Jr., Associate Judge.
Appellant, William DeFreitas, III, was found guilty by a jury of two counts of aggravated assault with a firearm. Based upon the jury's verdict, he was sentenced to serve a mandatory minimum of three years in the state prison system followed by two years probation. We reverse and remand for new trial, choosing to discuss only two of the three points which we duly considered.
The instant case emanated from an altercation in which Appellant allegedly pointed a laser-sighted firearm at two individuals. At the trial below, a total of ten witnesses were called to testify, six were called by the state and four were called by Appellant. The facts were seriously disputed and vigorously contested. We have chosen to summarize the critical testimony on a witness by witness basis.
Appellant testified, inter alia, that on June 3, 1994, in response to a telephone call he received that evening from his former girlfriend, Karen Perrone,[1] he went to the home of Natalie and Brett Fagan. Upon his arrival, he observed several individuals in the driveway area of the home. He stopped to see if Perrone was among them. When he did not see her, he drove to the end of the street, turned around and drove back past the home. As he slowly drove past the home, the individuals in the driveway area started toward his car in a threatening manner.[2] As they approached his car, he retrieved his handgun and pointed it in their general direction as they were actually approaching him. He explained that his actions were motivated by his own fear of these individuals as he felt threatened by their actions. He testified that he believed the situation justified at least the removal of his handgun from its holster. He denied threatening anyone with the gun or pointing it directly at anyone.
Appellant possessed a concealed weapon's permit and was lawfully in possession of the handgun on the night in question. He contended that he pointed the firearm in lawful self-defense without any specific intent whatsoever to do violence to anyone.
Karen Perrone, a 22-year-old receptionist and former girlfriend of Appellant, testified that she had indeed telephoned Appellant on the evening in question and desired to speak with him.[3] She testified further that she *595 observed six or seven individuals approaching Appellant's car. She described their actions in the following manner: "egging him on, throwing their arms out, and saying come on." Additionally, she testified that one of the individuals, Brett Fagan, had a gun or rifle[4] as he approached Appellant's car. She knew Appellant owned a handgun and had a permit to carry it. She also knew that the handgun was equipped with a laser sight. However, she testified that at the time of the altercation, she did not see any laser pointed at anyone nor did she see Appellant in possession of any handgun.
Appellant was not charged with the crime of stalking Perrone, nor was he charged with aggravated assault upon her. We have also noted that Brett Fagan, the individual Perrone said was in possession of a firearm as he approached Appellant's car, did not testify at trial.
Natalie Fagan, a 24-year-old employee of AmTrust Bank, testified, inter alia, that she saw Appellant park his car and point his gun at Victoria Palozzola. She said she actually saw the red light or dot from the laser and that it was on the bodies of both Palozzola and Miller.
Leslie Tropepe, a graduate of the University of Miami, testified, inter alia, that Appellant followed Perrone to the Fagan's residence and Perrone "freaked out" when she saw him. She and others were yelling and screaming words to the effect that "he's here to get Karen." She testified that she saw a red light coming from Appellant's car. She also said that Appellant stopped his car and pulled a gun and pointed it in her direction. She testified further that she and her friends were walking toward Appellant's car when Appellant pulled his gun and pointed it at them. Once they saw the gun, she said they turned away.
Victoria Palozzola, a 21-year-old young lady, testified, that on the night in question, she noticed that someone in a white car was following her and Perrone to the Fagan's home. She testified that Appellant pointed his firearm at her. She also said she saw the laser dot from the firearm on both her body and Miller's body. She testified further that she was afraid and called the police.
Herbert Miller, a motorcycle mechanic, testified, inter alia, that Appellant pointed a firearm at him. He also testified that at the time the firearm was pointed at him, he yelled Coconut Creek Police and held up his hands because he did not want to get shot and he thought Appellant would not shoot him if he believed that he was a law enforcement officer. He also testified the laser dot from the firearm at one point was on his chest and that he was afraid.
The two issues which we have chosen to discuss are: (1) whether or not the evidence was sufficient to sustain a conviction for the crime of aggravated assault with a firearm as charged, and (2) whether or not the prosecuting attorney was guilty of misconduct of such a nature and character as to constitute fundamental error.
*596 Appellant contends that the evidence was insufficient to sustain his convictions for aggravated assault with a firearm. More particularly, he contends that the state failed to prove beyond a reasonable doubt the necessary and critical element of specific intent to do violence to the person of another. We disagree.
We have considered the record in its entirety and in so doing have concluded that the evidence was sufficient to support the convictions; however, as to the issue of specific intent, the evidence was extremely close. Additionally, the evidence was extremely close as to whether or not the facts more closely fit the crime of improper exhibition of a dangerous weapon as opposed to aggravated assault. There is a vast difference between the two offenses, in that aggravated assault with a firearm is punishable by a mandatory minimum sentence of three years incarceration in the state prison system without the possibility of parole. There is no judicial discretion as to the mandatory minimum sentence. On the other hand, improper exhibition of a dangerous weapon is a first-degree misdemeanor and is punishable as such.
Appellant next contends, although he acknowledges that he did not make a proper legal objection nor a request for a curative instruction or a motion for mistrial, that he is nevertheless entitled to a reversal of his convictions and a new trial because the prosecuting attorney was guilty of numerous acts of prosecutorial misconduct of such a nature and character that the cumulative and collective effect rose to the level of fundamental error. We agree.
In Ryan v. State, 457 So.2d 1084, 1091 (Fla. 4th DCA 1984), we answered the same question presented in the instant appeal, the question being: "When does prosecutorial misconduct amount to fundamental error and thus becomes an exception to the contemporaneous objection and motion for mistrial rule?" Our answer to this question has not changed and remains as follows: "When the prosecutorial argument taken as a whole is `of such a character that neither rebuke nor retraction may entirely destroy their sinister influence ... a new trial should be granted, regardless of the lack of objection or exception.' " Id. at 1091 (quoting Peterson v. State, 376 So.2d 1230, 1234 (Fla. 4th DCA 1979)). We defined fundamental error, which can be considered on appeal even without a proper objection or preservation in the lower court, as error which goes to the foundation of the case or goes to the merits of the cause of action. Ryan, 457 So.2d at 1091.
In Ryan, we reversed a criminal conviction because of prosecutorial misconduct which occurred exclusively during the prosecutor's closing argument to the jury. In so doing, we noted that defense counsel failed to object to many of the prosecutor's egregious comments. Nevertheless, we found the following conduct rose to the level of fundamental error and ordered a new trial:

PROSECUTORIAL MISCONDUCT # 1
1) Appeal to Bias, Passion, and Prejudice
In Ryan, the prosecuting attorney said during final argument:

But the rich get preferential treatment. She was not handcuffed on the way to jail, just as any one else would be treated. Her Palm Beach lawyer boyfriend comes up and wants the money back and they give that back, because she comes from money, and unconsciously people tend to be subservient. And we are asking you not to be subservient to money.

* * * * * *

But we have shown that a rich person's daughter did do this. We have shown that a rich person's daughter didn't have much money herself. Maybe Daddy had to work for his money, way back when, but the children ought to not live up to their parent's potential. You've seen that before. Why should she, when Patty Ryan can go out and make hundreds of thousands of dollars, according to Carter Osleber, in this, why should she toil like everyone else?

* * * * * *
Now, will the truth surface? Will you people do something that later in your lives you'll regret? Will you listen to the man from Tampa, and he can go back to *597 Tampa, and we can all still live here in this community; and he says, "let her go. Let her walk out the door, because the State's case is not there." That this is all figments of someone's imagination. Are you going to do that?
* * * * * *
There's been a lot of publicity recently about the lifestyle in Palm Beach and some of you may find it interesting, but I think it proves a point. When you come from a rich familyand it's hard to live up to what your parents have shown, or your parents have been able to achieveand you can either try to repeat and do as well as your parents did, or you can try to cheat and get there through quick means.... It's life in the fast lane with cocaine. You've seen Time Magazine covers, I'm sure you've heard about it on T.V. It's an exciting drug. Movie stars take it. Movie stars get killed by taking it. It rules people's lives, but it's also exciting.
* * * * * *
There was a trial not too long ago, that you may recall, that involved another Patty, another rich Patty. Another rich Patty whose parents wanted to buy a fancy attorney to deal with the case and to hope to float some ridiculous defense to the jury. Her name was Patricia Hurst. [sic] The jury didn't buy that one, did they?
* * * * * *
Will this group tell the community they felt that the defendant had guilty knowledge of what was going to transpire? Or will they get caught up in words, like the Hinckley jury, and do something that later they regretted, because they felt they were confused.
Id. at 1087-88 (emphasis in original).

PROSECUTORIAL MISCONDUCT # 2
2) Personal Attacks on Defense Counsel
* * * * * *
I call upon Mr. Lazzara to be honest with you and to be open with you and to say, "Yes, these people were involved, but no, my client wasn't." But he's playing hide-the-ball.
* * * * * *
So any argument by the attorney from Tampa that tries to say, "Well, she didn't know it was cocaine," again, as he said in his opening statement, that is not being honest with you, and it doesn't matter under the law.
* * * * * *
In fact, if you recall, every item of evidence was objected to. Every item of evidence was objected to. If our case was so weak, if we had nothing, what was Mr. Lazzara afraid of?
Id. at 1089.

PROSECUTORIAL MISCONDUCT # 3
3) Commenting on Facts Not in Evidence
What type of real estate agent, again, is going to show people like Robert Bogue you saw what Robert Bogue looked, like, and Humberto; a couple of hooligans dressed in casual clothesa million-dollar property and not suspect anything was wrong.
* * * * * *
This is Jake Valley, who owned the plane. This is Jake Valley, that when Jay King and Detective Lockwood went out to interview him, he tricked them into saying, "Well, I'll meet you at such and such an address," and when they go there that's a law office. And the attorney says, "He'll answer two questions." Now, isn't it a coincidence that Jake's number is inverted the same way that Pat's number is inverted.
* * * * * *
You got Robert Bogue being out at the Diamond T. Ranch. The ranch that detective Murphy had said had been used repeatedly for drug drops.
Id. at 1089-90 (emphasis in original).

PROSECUTORIAL MISCONDUCT # 4
4) Law Enforcement Officers Believe Appellant was Guilty. *598 Do you think that they would bring this to you and have the State spend its time and money if there wasn't evidence that they wanted you to consider? So, there's common sense.
Id. at 1090 (emphasis in original).

PROSECUTORIAL MISCONDUCT # 5
5) Comments on Appellant's Failure to Testify
But we're asking youshe is telling you that she's not guilty of these crimes, and we're telling you, from the evidence, that she had participation.
You're here to determine whether she is guilty or whether she's not guilty, and innocent like she is claiming.

What would reasonable people say about that? They'd say, "That's not true. She's lying."

Id. (emphasis in original).
In Tuff v. State, 509 So.2d 953 (Fla. 4th DCA 1987), we reversed a criminal conviction for manslaughter because of prosecutorial misconduct which occurred exclusively during the prosecutor's final argument to the jury. In so doing, we said the following: "the test to be used, in the absence of objection to alleged prosecutorial misconduct, is whether the prosecutor's comments are fundamentally tainted." Id. at 956. We found the following misconduct rose to the level of fundamental error requiring a new trial:

PROSECUTORIAL MISCONDUCT # 1
Appellant contends during closing argument the prosecutor made several remarks that were prejudicial. Several of these remarks describe ordinary negligence, rather than culpable negligence, and suggest, by implication, this is the test in the present case. The prosecutor also indicated the judge would speak similarly. Hence, says appellant, the prosecutor conveyed that if Mrs. Tuff did not use reasonable care, she was guilty.
Id. at 955 (emphasis added).

PROSECUTORIAL MISCONDUCT # 2
Next, Mrs. Tuff urges that the prosecutor's Golden Rule argument, his reference to a parent's responsibility to keep his or her children safe, and his mention of the number of children each juror had (who had children), mentioning each juror by name, was inflammatory. The prosecutor also allegedly indicated Mrs. Tuff was a menace to the jurors' children.
Id. (emphasis added).

PROSECUTORIAL MISCONDUCT # 3
Next, appellant argues that the prosecutor argued facts not in evidence by saying, "If the thing is not cocked, and I ask you if it was cocked, what was it doing cocked?"
Id. (emphasis added).

PROSECUTORIAL MISCONDUCT # 4
Finally, appellant attacks the prosecutor's statement that Mrs. Tuff was told of her right to remain silent and her right to the presence of a lawyerappointed, if necessarybecause the officers know defense lawyers are sharp enough to claim the client was not given a lawyer. This, she urges, is a distortion and an unfair attack on defense counsel.

Id. (emphasis added).
In Knight v. State, 672 So.2d 590 (Fla. 4th DCA 1996), we reversed another criminal conviction because of prosecutorial misconduct which occurred exclusively during the prosecutor's closing argument to the jury. In Knight, Judge Dell, speaking for this court, stated:
We recognize that appellant failed to object to several of the prosecutor's improper comments and only made one objection at the end of the state's closing. However, this court has held that if the improper comments rise to the level of fundamental error, then multiple objections are not necessary... We hold that the totality of the prosecutor's improper comments reach to the very heart of the case and rise to the level of fundamental error obviating the need for multiple or contemporaneous objections.
Id. at 591.
We found the following conduct rose to the level of fundamental error and ordered a new trial:

*599 PROSECUTORIAL MISCONDUCT # 1

During closing argument, the prosecutor commented on Bacon's counsel's objection to Ms. Allison's testimony:
Now, I don't know why Halpern didn't want ID technician Allison to tell you about the fingerprint results. Maybe he will tell you, I don't know. I don't have a clue.
Maybe he is saving that and has something up his sleeve along with the perjured testimony and planted evidence.
I wanted to find out what the answer was, but you heard him object so he can explain it to you.
Id. at 590.

PROSECUTORIAL MISCONDUCT # 2
The prosecutor also made at least five references to one Vetus McCray stating that he was a "criminal" and would have lied to the jury if called to testify. Vetus McCray had been seen with appellant and the codefendants on the day of the incident, but he was not charged or called as a witness in the case.
Id. at 590-91.

PROSECUTORIAL MISCONDUCT # 3
The prosecutor further argued that a not guilty verdict meant the detectives were criminals and perjurers and effectively sought to poll the jurors on this point when he stated:
Unless you believe [Detective Camilo's] a perjurer, he is a criminal and likes to point the finger at innocent people, if you believe that, let me know. I will sit down now.
Id. at 591.
In Shorter v. State, 532 So.2d 1110 (Fla. 3d DCA 1988), the Third District Court of Appeal reversed a second-degree murder conviction because of prosecutorial misconduct which occurred during the prosecutor's closing argument to the jury and during his cross-examination of the defendant. We acknowledge that Shorter involved a harmless error analysis which is not the proper test to be applied in the instant case. We cite to Shorter because it provides a further detailed description of condemnable prosecutorial misconduct. In this sense, it is instructive and helpful.
In Shorter, the Third District Court of Appeal stated the following regarding the misconduct of the prosecutor:
We conclude that the above-stated prosecutorial misconduct, when considered in totality, deprived the defendant of a fair trial in this otherwise close case on whether the defendant shot deceased with criminal intent or in self-defense ... We cannot agree that this prosecutorial misconduct was harmless under the circumstances of this case; on the contrary, we conclude that the said conduct may very well have tipped the scales in favor of the state.
Id. at 1111.
The precise misconduct in Shorter was as follows:

PROSECUTORIAL MISCONDUCT # 1
First, we conclude that the prosecuting attorney was guilty of improper conduct in his suggestion made during final argument to the jury that the defendant's sister had previously attacked the homicide victim with a knife; there was utterly no evidence adduced below to support this suggestion.
Id.

PROSECUTORIAL MISCONDUCT # 2
Second, we conclude that the prosecuting attorney was also guilty of improper conduct by suggesting on cross examination of the defendant that the defendant had put three police officers in the hospital when the defendant was arrested in this case. Assuming there was some evidence to support this suggestion, we conclude such evidence would have been inadmissible in evidence as its prejudicial impact far outweighed whatever limited relevance it might have as to defendant's alleged consciousness of guilt. Although the trial court correctly sustained the defendant's objection to the prosecuting attorney's improper question, its subsequent cautionary instruction failed to undo the damage done by this time bomb of a question.
Lastly, we conclude that the above-stated prosecutorial misconduct, when considered *600 in totality, deprived the defendant of a fair trial in this otherwise close case on whether the defendant shot the deceased with criminal intent or in self-defense;
Id. (citations omitted).
Measuring the prosecuting attorney's conduct in the instant case by the aforementioned well-settled standard, we are persuaded that Appellant has been denied one of his most precious constitutional rights, the right to a fair criminal trial by the cumulative effect of one prosecutorial impropriety after another. Furthermore, we are equally persuaded that the cumulative effect of the numerous acts of prosecutorial misconduct herein were so prejudicial as to vitiate Appellant's entire trial. In addition, we are likewise persuaded beyond question that the cumulative effect of the numerous acts of misconduct were of such a character that neither rebuke nor retraction could have or would have destroyed their sinister influence. The prosecutorial misconduct, taken in its entirety and viewed in its proper context, is of such prejudicial magnitude that it enjoys no safe harbor anywhere in the criminal jurisprudence of this state. Accordingly, we find fundamental error.

PROSECUTORIAL MISCONDUCT # 1
First, we conclude that the prosecuting attorney was guilty of misconduct by suggesting or inferring on cross-examination of Appellant that Appellant was a person with a temper which perhaps was so bad that it led to him hitting his own sister in the head with a baseball bat.[5] We conclude further that this evidence was inadmissible for reasons too numerous to set forth herein. Suffice it to say that the evidence was of little or no probative value and was so inflammatory that any probative value it might possibly have had was clearly outweighed by its prejudicial effect.
We have further concluded that the dignity of the office of prosecuting attorney demanded, at the very least, a request for a side bar conference or a proffer outside the presence of the jury to determine the admissibility of this highly inflammatory evidence. We note that although the prosecutor was well aware of the questionable admissibility of this evidence, he did not request a side bar or a proffer, thus depriving the trial court of the opportunity to determine the admissibility of this evidence before it was imparted to the jury.[6] Had a side bar or proffer been requested and thereafter the trial court allowed this evidence, there would have been no sustainable basis for this particular aspect of Appellant's prosecutorial misconduct claim.
We again find it necessary to remind the prosecutor of the following often cited well-settled principle: the prosecutor's duty is not to obtain convictions but to seek justice, and he or she must exercise that responsibility with the circumspection and dignity the occasion calls for. The prosecutor's case must rest on evidence, not innuendo. If the prosecutor's case is a sound one, then the evidence should be enough. If it is not sound, the prosecutor has a duty to refrain from innuendo to give the case a false appearance of strength. The innuendo, in the case at bar, to the effect that Appellant has a terrible temper which perhaps may have led to him *601 hitting his sister in the head with a baseball bat, had no place in the Appellant's criminal trial. Standing alone, it may not have constituted fundamental error; however, its contribution to the cumulative effect of the entire misconduct in this case simply is more than the constitutional right to a fair criminal trial can bear.

PROSECUTORIAL MISCONDUCT # 2
Second, we conclude that the prosecuting attorney was guilty of improper conduct during his final argument by impermissibly asking the jurors to place themselves in the position of the victims and asking them to think how they would feel if the crime happened to them.[7] We recognize that often times the line between the inflammatory and the dramatics is not always clear or bright. Vigorous and diligent advocacy on the part of the state is not only commendable, but is necessary to make our system of jurisprudence work. However, as far as golden rule arguments are concerned, the lines are clear and bright, simply put they are improper. In short, they enjoy no safe harbor in the trial of a criminal case. In Miku v. Olmen, 193 So.2d 17 (Fla. 4th DCA 1966), we said that golden rule arguments were per se prejudicial and required a new trial. Only recently have we receded from this principle. See Cleveland Clinic Florida v. Wilson, 685 So.2d 15 (Fla. 4th DCA 1996).
In the instant case, the prosecutor impermissibly placed before the jury evidence that Appellant had a temper and hit his sister in the head with a baseball bat. Unfortunately, he compounded this problem by asking the jury to just imagine how terrifying it would be if the gun in question was pointed at their [the jurors] chest by this same person.

PROSECUTORIAL MISCONDUCT # 3
Third, we conclude that the prosecutor was guilty of misconduct during his final argument by impermissibly making a comparison between Appellant's case and trial and the "O.J. Simpson" case.[8] This reference, coupled with the reference to Appellant as a stalker, possessive ex-boyfriend who disapproved of his ex-girlfriend's friends, simply crossed the line of proper vigorous and diligent advocacy and violated the rule against inflammatory argument. It represents an appeal to passions and bias; moreover, it is condemnable for the same reasons we condemned the Patty Hearst comparison in Ryan.
In the instant case, the prosecutor's impermissible reference to the O.J. Simpson, standing alone, may not have been sufficient to reach the very heart of Appellant's criminal trial and may not have risen to the level of fundament error; however, its contribution to the cumulative effect of the totality of the misconduct reached far beyond that which the constitutional right to a fair criminal trial allows.
We have considered Appellant's remaining point and found it to be without merit. However, because we are convinced beyond any real question that the prosecutor's conduct, viewed in its entirety, constituted prosecutorial misconduct of such extreme nature and character that it utterly destroyed Appellant's most precious right under our criminal justice system, the constitutional right to a fair criminal trial, we reverse the conviction and sentence below and remand this cause for a new trial. In so doing, we continue to adhere to the proposition adopted by this court that we "perceive very few instances where remarks or conduct by an attorney are of such sinister influence as to constitute *602 reversible error absent objection." Norman v. Gloria Farms, Inc., 668 So.2d 1016, 1023 (Fla. 4th DCA 1996). Certainly, the better practice is to bring the matter promptly to the attention of the trial judge. Furthermore, defense counsel has the duty to remain alert to such things in fulfilling his responsibility to see that his client receives a fair trial. Except in rare instances where a grievous injustice might result, this court is not inclined to excuse counsel for his failure in this regard. We think this case falls within the exception.
REVERSED AND REMANDED.
GUNTHER and PARIENTE, JJ., concur specially with opinions.
GUNTHER, Judge, concurring in result only.
I agree this case should be reversed.
The Defendant argues that the cumulative instances of prosecutorial misconduct are either independently fundamental error or can collectively constitute fundamental error. In doing so, the Defendant cites cases where objections were lodged in response to prosecutorial misconduct rather than cases that deal with the fundamental error concept. Whether the prosecutor's unobjected-to conduct may be deemed error throughout the trial is not the issue here; whether the error rose to the level of being fundamental in nature is. The Defendant has not established that he was deprived a fair trial when his attorney chose, for whatever reason, not to object to the events about which he now complains. While the prosecutor's conduct may constitute error, I do not believe that all of his conduct, considered either independently or collectively, can be deemed fundamental error.
Generally, an appellate court will not disturb a jury's verdict because of improper remarks by the prosecutor unless the remarks are accompanied by a contemporaneous objection. Akin v. State, 86 Fla. 564, 98 So. 609 (1923). This general rule is subject to the fundamental error exception, that "if the improper remarks are of such character that neither rebuke nor retraction may entirely destroy their sinister influence," a new trial should be granted despite the lack of objection. Id. 98 So. at 612; see Pacifico v. State, 642 So.2d 1178, 1184 (Fla. 1st DCA 1994); Finder v. State, 396 So.2d 272, 273 n. 3 (Fla. 3d DCA 1981).
Admittedly, the concept of "fundamental error" is a difficult one to define, partially because of the courts' unwillingness to recognize the narrowness of the doctrine. See Hagan v. Sun Bank of Mid-Florida, N.A., 666 So.2d 580, 583-84 (Fla. 2d DCA 1996); LeRetilley v. Harris, 354 So.2d 1213, 1215 (Fla. 4th DCA 1978). But in its essence, fundamental error is error that "goes to the foundation of the case" or "the merits of the cause of action." Sanford v. Rubin, 237 So.2d 134, 137 (Fla.1970). Fundamental error is only that error that is so prejudicial and "so extensive that its influence pervades the trial, gravely impairing a calm and dispassionate consideration of the evidence and the merits by the jury." Tyus v. Apalachicola N.R. Co., 130 So.2d 580, 587 (Fla.1961). It is error that "vitiate[s] the entire trial," Pacifico v. State, 642 So.2d 1178, 1184 (Fla. 1st DCA 1994), error that is "basic to the judicial decision under review and equivalent to a denial of due process," Mordenti v. State, 630 So.2d 1080, 1084 (Fla.1994)(quoting State v. Johnson, 616 So.2d 1, 3 (Fla.1993)); accord Ray v. State, 403 So.2d 956 (Fla.1981)(citing Castor v. State, 365 So.2d 701, 704 n. 7 (Fla.1978)); see LeRetilley v. Harris, 354 So.2d 1213 (Fla. 4th DCA 1978). Consistent with this limited definition, our supreme court has warned, "The Appellate Court should exercise its discretion under the doctrine of fundamental error very guardedly." Sanford, 237 So.2d at 137.
The other panel members believe there are three errors that either independently or cumulatively constitute fundamental error in this case. These errors include a reference to the O.J. Simpson trial during closing argument, a "golden rule" argument during closing argument, and improper questioning by the prosecutor during cross-examination of the Defendant. I find only one error that is so egregious it could warrant a reversal despite the lack of objection. That error is the prosecutor's improper cross-examination of the Defendant that was calculated to evoke a *603 temper from the Defendant followed by remarks about the Defendant's demeanor on the witness stand. Before I address that error, however, I will discuss the other two comments deemed fundamental error by the other members of the panel.
I disagree that the prosecutor's reference to the O.J. Simpson trial was improper. Considering the comment in context, the prosecutor was merely pointing out that this is a case that involved eyewitness testimony of the alleged crime. The reference to the O.J. Simpson trial was simply the State's attempt to use a hypothetical scenario that the jury would understand. In that respect, the comment was not even erroneous, let alone did it singularly rise to the level of fundamental error.
I disagree with the contention that the O.J. Simpson reference in conjunction with the prosecutor's characterization of the Defendant's previous behavior as "stalking" exacerbates the impropriety of the comment. The prosecutor's use of the word "stalking" is in the general sense of the word, as the trial court so determined in its order denying the Defendant's motion for new trial. In short, I conclude that referring to the O.J. Simpson trial was not inflammatory and not calculated to arouse the jury's passions. The O.J. Simpson trial had nothing whatsoever to do with the instant case, so to conclude that the jury could be influenced by an idle passing allusion to the O.J. Simpson trial appears to me to undermine the jury's intelligence. See Cleveland Clinic Fla. v. Wilson, 685 So.2d 15, 17 (Fla. 4th DCA 1996)(en banc)(Farmer, J., specially concurring).
But even assuming the O.J. Simpson comment was error, I certainly cannot agree that it was fundamental error because in my view, the comment was in no way so sinister that neither rebuke nor retraction could not have eradicated any harm. Ryan v. State, 457 So.2d 1084, 1091 (Fla. 4th DCA 1984). The influence of this singular comment certainly did not "pervade" or "vitiate" the entire trial, and neither was it the equivalent of a denial of due process. See Mordenti, 630 So.2d at 1084; Tyus, 130 So.2d at 587; Pacifico, 642 So.2d at 1184. Had defense counsel properly objected to the comment when it occurred and had the trial court agreed that the comment was improper, any impropriety could have been erased by a curative instruction to the jury. See Akin, 98 So. at 612; cf. Reynolds v. State, 580 So.2d 254, 256 (Fla. 1st DCA 1991)(holding that improperly "infect[ing] the trial with racial prejudice and unfairness" denied "the defendant due process of law").
I also do not agree that the prosecutor's "golden rule" argument constituted fundamental error in and of itself, even assuming that it was improper for the prosecutor to ask the jury to imagine what it would be like if a gun laser were pointed at their chests. See Grushoff v. Denny's, Inc., 693 So.2d 1068, 1069 (Fla. 4th DCA 1997)(holding that the generic use of "you" in closing argument does not turn a remark into a golden rule argument, let alone a highly prejudicial argument that requires reversal despite objection). I do not believe that this comment alone was so "prejudicial as to sway the jury from its dispassionate consideration of the case." Wilson, 685 So.2d at 16. Neither has the Defendant convinced me that the jury could have been influenced by this comment to such a degree that it relied upon this comment rather than the evidence in returning its verdict of guilt. Again, if the Defendant believed the comment was improper, then an objection during trial should have been lodged and any harm could have been eradicated. Because the Defendant did not do this, I cannot agree that the Defendant is entitled to a new trial because any error is not fundamental in nature.
To allow broad direct review of a criminal trial on the basis of fundamental error supplies no motivation whatsoever to a defense attorney to object when various errors occur throughout a trial. To the contrary, a defense attorney might well be motivated to not object to the errors as they occur and then if the verdict is not to his or her client's favor, he has a "hip-pocket" appeal because the defense attorney can argue that so many unobjected-to errors occurred during trial that the errors magically transformed into fundamental error on direct appeal. I adopt the view of Judge Griffin of the Fifth District: "I have come to be of the view that a *604 party who does not object to counsel's comments in closing should not be allowed to complain of those comments on appeal. It is anomalous that the more objectionable the comment, the less the incentive to object." Walt Disney World Co. v. Blalock, 640 So.2d 1156, 1159 (Fla. 5th DCA 1994)(Griffin, J., concurring in part and dissenting in part). As a general rule, I believe that the better approach for routinely addressing multiple, unobjected-to instances of prosecutorial misconduct is via a rule 3.850 motion, rather than expanding the doctrine of fundamental error and creating such an easy argument for reversal on direct appeal. See generally Chandler v. Dugger, 634 So.2d 1066 (Fla.1994)(addressing unobjected-to prosecutorial misconduct as ineffective assistance of counsel in rule 3.850 motion).
In my view, there is only one error in the instant case that rises to the level of fundamental error and entitles the Defendant to a new trial despite his attorney's lack of an objection. This error occurred while the prosecutor cross-examined the Defendant on the witness stand, asking him whether he had ever hit his sister with a baseball bat. Three things contribute to this error being deemed fundamental in this case: (1) The prosecutor's improper questioning of the Defendant with the intent of eliciting a hostile reaction from the Defendant; (2) the Defendant's hostile reaction to the prosecutor's improper question; and (3) the fact that the prosecutor took advantage of the Defendant's hostile reaction.
Standing alone, the prosecutor's improper question of whether the Defendant ever hit his sister with a baseball bat is not so egregious as to rise to the level of fundamental error. Any prosecutor's goal during trial is to show the jury that the defendant is guilty and capable of committing the crimes with which he or she is charged. Of course, if a defendant's own actions during trial show the jury that he or she could have committed the crime charged, then those actions speak louder than any evidence or testimony presented by the State. Thus, a powerful prosecutorial strategy might be to elicit a "temper tantrum" from a defendant, especially when that defendant is charged with a violent or hostile crime. It is fair play for a prosecutor to use proper questioning to elicit such a response from a defendant, and if the defendant displays a temper on the stand, then it is certainly fair play for the prosecutor to comment on the defendant's demeanor. However, when the prosecutor uses improper questioning calculated to elicit a negative response from the defendant, then the prosecutor crosses the line.
When the Defendant reacted with hostility at the prosecutor's improper questioning, the prosecutor had very effectively shown the jury, through the Defendant's own actions, that the Defendant had a quick and violent temper, even though the Defendant's words themselves denied such allegations. Had the prosecutor stopped there, then fundamental error may not have resulted. Instead, the prosecutor opportunistically capitalized on the Defendant's conduct by repeatedly highlighting the temper tantrum he created through improper questioning, and in doing so, the prosecutor committed fundamental error. Even if the defense attorney lodged a contemporaneous objection, secured a ruling on the objection he made, or asked for a curative instruction, the damage could not have been undone because it would have been impossible for the trial court to erase the Defendant's behavior from the jurors' minds when the prosecutor improperly evoked such a response and then repeatedly reminded the jury of it. See O'Rear v. Fruehauf Corp., 554 F.2d 1304, 1309 (5th Cir.1977)(stating "you can throw a skunk into the jury box and instruct the jurors not to smell it, but it doesn't do any good"). Considering the totality of the prosecutor's actions to improperly persuade the jury that the Defendant had a quick and violent temper and therefore must be guilty of the crime charged, neither rebuke nor retraction could have entirely destroyed the sinister influence of the prosecutor's actions under the facts of this particular case. See Akin, 98 So. at 612. The prosecutor's actions in this case constituted error so "basic to the judicial decision under review and equivalent to a denial of due process" that reversal is necessary even absent an objection. Mordenti, 630 So.2d at 1084. For that reason and that reason alone, fundamental error was committed in this *605 case. Accordingly, on this basis alone, I would reverse.
PARIENTE, Judge, concurring in result only.
I concur in a reversal based on the prosecutor's improper questions and argument arising from what I will refer to as the baseball bat incident. The series of improprieties began when the prosecutor cross-examined defendant about an alleged act of misconduct; specifically, if he had ever hit his sister in the head with a baseball bat. This question constituted a blatantly impermissible attempt to place prejudicial information before the members of the jury, from which they could then infer that defendant possessed a propensity to commit violent acts.
It is axiomatic that evidence of other crimes, wrongs or acts is inadmissible when the evidence is relevant solely to prove bad character or propensity to commit a crime. See § 90.404, Fla. Stat. (1995); Czubak v. State, 570 So.2d 925, 928 (Fla.1990). When such irrelevant evidence is admitted it is "presumed harmful error because of the danger that a jury will take the bad character or propensity to crime thus demonstrated as evidence of guilt of the crime charged." Straight v. State, 397 So.2d 903, 908 (Fla. 1981).
The state argues that defendant opened the door to this line of questioning. It is true that earlier in the trial defendant attempted, through his attorney, to question witnesses about whether defendant had ever demonstrated a propensity for violence. These attempts were met with repeated objections from the prosecutor, who asserted that such questioning was "strictly prohibited by the statute rules." The objections were sustained by the trial court.
It is thus difficult to understand how the state can claim that defendant opened the door when it was the prosecutor who asked the series of impermissible questions concerning prior acts of misconduct on cross-examination. See Weitz v. State, 510 So.2d 1060 (Fla. 4th DCA 1987); Renney v. State, 543 So.2d 420 (Fla. 5th DCA 1989); Dixon v. State, 426 So.2d 1258 (Fla. 2d DCA 1983); cf. Bozeman v. State, 698 So.2d 629 (Fla. 4th DCA 1997). Moreover, even when a defendant places a character trait in issue, it is erroneous for the state to rebut this evidence with specific acts of misconduct. See Dupont v. State, 556 So.2d 457 (Fla. 4th DCA 1990) (citing Cornelius v. State, 49 So.2d 332, 335 (Fla.1950)); Weitz, 510 So.2d at 1061.
The defense lawyer attempted to interpose an objection to these improper questions, but defendant responded before the trial court could rule.[9] The irreparable damage was done.
Not only was the initial question concerning the baseball bat incident a highly improper and inflammatory oneit was also a low blow because the prosecutor asked it without following the well-established procedure of first obtaining permission from the trial court when seeking to inquire about specific prior acts of misconduct. See Rhodes v. State, 547 So.2d 1201, 1205 (1989); Carpenter v. State, 664 So.2d 1167, 1169 (Fla. 4th DCA 1995), review denied, 680 So.2d 421 (Fla. 1996); Butler v. State, 376 So.2d 937 (Fla. 4th DCA 1979); Greenfield v. State, 336 So.2d 1205, 1207 (Fla. 4th DCA 1976). The very reason for requiring that a proffer first be made out of the presence of the jury is to give the trial court an opportunity to determine whether "counsel is proceeding in good faith, since `wafting before the jury questions which have no basis in fact ... can be fatal to the defendant.'" Carpenter, 664 So.2d at 1169 (quoting United States v. Nixon, 777 F.2d 958, 970 (5th Cir.1985)); see also Michelson v. United States, 335 U.S. 469, 480-81, 69 S.Ct. 213, 220-21, 93 L.Ed. 168 (1948) (the trial court must satisfy itself that counsel was not "merely taking a random shot at a reputation imprudently exposed or asking a groundless question to waft an unwarranted innuendo into the jury box").
*606 Apparently, this prosecutor did not care whether defendant admitted or denied the incident or whether he was disregarding the well-recognized practice of first seeking court approval. The questions had the desired effect of baiting defendant into an angry denial and hostile reaction. This rogue strategy was especially effective since, as a result of defendant's emotional reaction to the questioning, the trial court admonished defendant in the presence of the jury to "answer the questions" and "not make side comments."
The prosecutor then exploited defendant's reaction, highlighted by the trial court's admonishment, to ask defendant if he had a temper.
Finally, in closing argument the prosecutor used defendant's reaction to this improper cross-examination to imply that defendant's "temper" affected his actions on the night in question:
[D]id you get a glimpse of a little bit of that temper when I asked him a question on cross examination? ["]I don't appreciate that.["] That's what he told me and I don't even know him. And you saw him when you saw his body language. You saw how he glared from a question in court. Think maybe that temper got a little bit out of hand that night on June 3rd of 1994?
While it is not impermissible to cross-examine a witness or a defendant with the hope of revealing to the jury the true personality of the individual and then comment on this in closing argument, the questions used as bait must be permissible ones. See Gonzalez v. State, 588 So.2d 314 (Fla. 3d DCA 1991).
As our supreme court observed regarding the obligation of the prosecutor:
[A prosecuting attorney's] interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done.... He may prosecute with earnestness and vigorindeed, he should do so. But while he may strike hard blows, he is not at liberty to strike foul ones. It is as much his duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one.
Craig v. State, 685 So.2d 1224, 1229 (Fla. 1996) (emphasis supplied) (quoting Berger v. United States, 295 U.S. 78, 88, 55 S.Ct. 629, 633, 79 L.Ed. 1314 (1935)). While I would not want to "frustrate prosecutorial zest," see Ryan v. State, 457 So.2d 1084, 1091 (Fla. 4th DCA 1984), "obtaining a conviction at the expense of a fair trial is not justice." Von Carter v. State, 468 So.2d 276, 279 (Fla. 1st DCA 1985).
I conclude that as a result of the low blows arising from the questioning and argument regarding the baseball bat incident, defendant was denied that to which every defendant is entitledthe right to a fair trial. See Knight v. State, 672 So.2d 590 (Fla. 4th DCA 1996); Ryan, 457 So.2d at 1091; Peterson; Gonzalez, 588 So.2d at 316. Because the issue of defendant's intent was critical to the resolution of his guilt, the prosecutor's successful and completely improper attempt to prove defendant had a temper went to "the essence of a fair and impartial trial" and thus constituted fundamental error in this case. See Scoggins v. State, 691 So.2d 1185, 1188 (Fla. 4th DCA 1997), and cases cited therein.
Lastly, although I would not find that the unobjected-to closing argument remarks alone warrant reversal, neither do I agree that either remark was a permissible or proper argument. The golden rule argument concerning the laser gun constituted an attempt by the prosecutor to place the jurors directly in the victims' shoes by asking the jury to "imagine how terrifying this laser [from the gun] would be if it was on your chest." The comparison with the O.J. Simpson trial simply had no place in this case. These arguments urged the jury "to convict the defendant for a reason other than his guilt of the crimes charged." Northard v. State, 675 So.2d 652, 653 (Fla. 4th DCA), review denied, 680 So.2d 424 (Fla.1996).
NOTES
[1] Q. Was there a reason you just didn't speed off?

A. Well, I was looking for Karen, you know. I mean, her car. Also, I wanted to see her.
Q. She had called you?
A. Right.
(T 178) (emphasis added)
Q. On June 3rd, how did you happen to go to the home of the Fagan's
A. I wanted to talk to Karen. We had talked previously and
(T 174) (emphasis added)
[2] See T 176, line 8-25; T 177, line 1-14
[3] Q. What was the purpose of your call?

A. Well, I hadI didn'tI wasn't sure if it was him or not, but I had an idea. So I called him because I wanted to talk to him.
Q. Did you want him to come to that house?
A. Yes.
Q. Did he know where that house was?
A. Yes, he know where it was.
Q. And were you prepared to talk to him on that evening?
A. I thought I was. But when I first called him.
Q. You never did get back to the Fagan house, or at least within that period of time?
A. No. It was after I called him, I went out to dinner. And me and Natalie and
(T 146, lines 20-25; T 147, lines 1-9) (emphasis added)
Q. Now, this house that Bill showed up at, this was his house was it?
A. Bill's house, no sir.
Q. Nobody invited him there; correct? Did you invite him there that evening?
A. No.
Q. Do you know of anybody that invited him that evening?
A. No. Well, I did call him.
Q. Okay. Prior to you calling him, did anybody invite him to the house that evening?
A. No.
(T 149, lines 1-11) (emphasis added)
Q. Do you know whether Karen called Billy from you home that night?
A. Yes, I believe she did.
Q. Do you knowDo you know why she called Billy?
A. I don't know.
Q. Not what she said, but do you know why?
A. I don't know.
Q. She used your telephone?
A. Yes, sir.
(T 31, lines 6-15)
[4] Q. And do you know what they did when they got outside, what you observed?

A. They were approaching the car.
Q. Do you know how close they got to the car?
A. Yes. They were, you know, egging him on. Throwing their arms out like, you know, come on, you know.
Q. Was Brett Fagan there that night?
A. Yes he was.
Q. Did Brett Fagan have anything with him by way of a protective device?
A. Yes.
Q. What did he have?
A. Some type of a gun or rifle. I mean, it was a rifle. I don't know what kind.
(T 142, lines 3-23)
[5] Q. And you stated that Victoria didn't like you very much.

A. Not in any way.
Q. Was itVictoria didn't like you because you were physically abusive to her?
A. I have never been physically abusive.
Q. You have never been physically abusive to anybody?
A. No.
Q. Did you ever hit your sister in the head with a baseball bat?
A. That's when we were little kids. I swinging the bat and stopped at her, not actually hitting her. But there was no way I would hit my sister on purpose.
Mr. Beamer [Defense Counsel]: I'm going to object
A. I don't appreciate that.
Mr. Beamer: Sauce for the goose is sauce for the gander as well.
A. I don't appreciate that at all.
THE COURT: Sir. When you answer the questions you'll not make side comments.
Q. Do you have a temper?
A. No, Sir.
[6] Q. Has Billy ever demonstrated any kind of violent nature?

THE PROSECUTOR: I'm going to object to that question. It's strictly prohibited by the statute rules.
THE COURT: Sustained.
[7] It's a gun. It's a real gun. It's a gun with a laser on it. Just imagine how terrifying this laser would be if it was on your chest?
[8] But just ponder this, then I'm going to sit down. If there were four people that saw O.J. hit and murder those people were at that time Leslie, Victoria and Herbie, and they saw it, then O.J. ran away, got in his Bronco and starts leaving, and then Officer Vernetti stopped O.J. and found that weapon, that murder weapon in that vehicle, is there anybody in this country that wouldn't convict O.J.? That's what we have here.

* * * * * *
So was he [Appellant] some nonviolent person who works with mentally retarded children and was attacked by Herbie and the other girls that evening? Or was he this angry ex-boyfriend of Karen Perrone who was stalking her in the white car and disapproved of her friends. That's for you to decide.
(Emphasis added)
[9] Footnote 5 of Judge Baker's opinion sets forth the pertinent questioning on this issue. The trial court's written order denying the motion for new trial reflects the trial court's belief that the objection was sustained and the jury ordered to disregard the comment. The transcript does not bear this out.