193 So.2d 679 (1966)
John GETSIE III, Appellant,
v.
STATE of Florida, Appellee.
No. 215.
District Court of Appeal of Florida. Fourth District.
December 30, 1966.
Rehearing Denied January 30, 1967.
*680 Joseph A. Varon, Hollywood, and C. Wendell Harris, Vero Beach, for appellant.
Earl Faircloth, Atty. Gen., Tallahassee, and James T. Carlisle, Asst. Atty. Gen., Vero Beach, for appellee.
KANNER, Associate Judge (Ret.).
Defendant-appellant, John Getsie III, was charged with and convicted of manslaughter in the fatal shooting of his wife. The basis for the State's prosecution of him was manslaughter through culpable negligence; Getsie's defense at the trial was that of accident. The only evidence under which the State sought to prove culpable negligence was the version of Getsie himself, there having been no other eyewitness.
Appealing, Getsie presents the sole question, "Was the evidence adduced sufficient to convict defendant of the crime charged beyond and to the exclusion of a reasonable doubt where there was no other evidence legally sufficient to contradict defendant's explanation of the homicide?" The State rephrases the point to read, "Whether the evidence was sufficient to sustain a conviction of manslaughter through culpable negligence?"
It appears factually that, at the time of the unfortunate occurrence, Getsie, 24 years of age, had been married to the deceased, Linda Jean, 21 years old, for 9 months. The time was the day after Christmas, the place the livingroom in the apartment of the two, where the presents were still under the Christmas tree. Getsie had been making a sandwich from the 20 pound turkey they had for Christmas. For more than a year, he had been a member of the auxiliary police of the City of Fort Lauderdale, and one of his presents was a new gun purchased by Jean and placed under the tree prior to Christmas. Among *681 the other presents were a mixer and hair dryer from Getsie to Jean, a gun belt and new handcuffs for Getsie. Jean was playing with the hair dryer and its attachment for doing nails, put it back, and was sitting in a chair smoking a cigarette. Getsie picked up the gun and was admiring it; he was proud of it and was showing it to Jean, pulling the hammer back and forth and releasing it slowly with his index finger, seeing how it worked. He was like a child with a new toy. He had had experience with guns, had a permit, and had received certain training in the safe handling of weapons in the Navy and at the local firing range under supervision of a police sergeant. Jean told him not to be "goofing around with the gun in the house." He replied that nothing could happen, that he was careful and knew what he was doing with a gun. Getsie knew the gun was loaded.
Meanwhile, Getsie was walking over to the chair toward Jean, holding the gun, releasing the hammer as above described; he wasn't thinking of the gun being pointed at Jean at the time. By Getsie's statement given to the police, there was recorded the question relative to where the gun was pointed with Getsie's answer that he was pointing it at her; but by his testimony, he did not remember answering anything like that. He did not have the gun pointed straight ahead when he was walking toward Jean; he guessed it was about a foot and a half away from her; he started to sit on her lap or leg; she extended her right arm to greet him, holding a cigarette in her left hand. That was when the gun went off. There was no friction, ill will, or argument at the time; he loved his wife very much. After he saw she had been wounded, he called a neighbor to get an ambulance, administered mouth-to-mouth resuscitation, took off his shirt to put over his wife's wound.
The above is substantially the gist of Getsie's version as gleaned from his testimony and from the statement which he gave the police as he waited in the emergency room of the hospital while his wife was still in surgery, or was being operated on. By the police testimony, he was obviously and visibly upset at the time he gave the statement.
Both the mother and the sister of the deceased testified for Getsie. The mother went to the home of the couple on Christmas Eve, the sister on Christmas morning. Each had been shown the gun, the mixer, the hair dryer, and other presents under the tree. While the mother was there, Getsie, after showing her the gun, started putting the mixer together, showing her the grinder and so on, and told Jean to show her mother the nail filer on the hair dryer and all those things that went with it. Both the mother and the sister testified that Getsie had a good reputation. Getsie and his mother-in-law each stated that he had not wanted to go back to the apartment after Jean's death but lived with the mother-in-law.
Under his single appeal question, Getsie urges that his version constituted the only evidence of the events and circumstances of the occurrence, that it is uncontradicted by any other evidence adduced, that it does not demonstrate culpable negligence within the meaning of the manslaughter statute, section 782.07, F.S.A., and that the State failed to carry its burden of proof. For affirmance, the State contends that Getsie's own testimony and statement given to the police officers disclose culpable negligence sufficiently to support his conviction under the statute.
Culpable negligence within the contemplation of section 782.07 such as can sustain a conviction of manslaughter has been defined in Florida many, many times, as follows:
"To constitute manslaughter by `culpable negligence', death must result from conduct of a gross and flagrant character, evincing reckless disregard of human life, or of safety of persons exposed to its dangerous effects, or there must be *682 entire want of care which would raise presumption of conscious indifference to consequences or which shows wantonness or recklessness or grossly careless disregard of safety and welfare of public, or that reckless indifference to rights of others which is equivalent to intentional violation of them."
Miller v. State, Fla. 1954, 75 So.2d 312; Day v. State, Fla.App. 1963, 154 So.2d 340; Fort v. State, Fla. 1956, 91 So.2d 637.
For affirmance, the State relies upon the case of Williams v. State, 1925, 89 Fla. 475, 104 So. 782, saying that, under authority of it, the judgment of the trial court should be upheld. The Williams case, however, is distinguishable. There, the defendant was indicted for murder in the first degree under two counts, one alleging in effect that the accused, with a premeditated design to kill one C., shot and killed a child; the other alleging in effect that the accused, with a premeditated design to kill the child, did fatally shoot her. The defendant, convicted of manslaughter, appealed; and the supreme court affirmed the judgment of conviction. Since the State relies upon the Williams case, we have examined the original record. It appears that on the appeal the defendant contended the jury should have accepted her version that the fatal pistol shot which killed the child was the result of accidental discharge of the weapon, urging that the verdict of manslaughter was unsupported by the evidence. The State asserted it had produced evidence which proved that the firing of the pistol was not an accident but was with premeditated design to kill C., as charged in the indictment under the first count. In seeking to establish the guilt of the defendant, the State produced several witnesses who were present at the scene, while the defense offered only the testimony of the defendant. By the testimony, the dance hall where the shooting took place, as the witnesses referred to it, was a "jouck"; and, in the words of one witness, "* * * there was lots of folks there". It was undisputed that defendant held concealed in her lap a pistol and that its discharge killed the child. One witness, C., was seated upon a table when the bullet hit the child as she suddenly passed between him and the defendant, who was seated on a bench. There was testimony as to events and words, both before and after the shooting and at the time the child was shot to demonstrate the circumstances of defendant's possession of the pistol, why she had it, and what the situation was when the weapon discharged.
In affirming, the supreme court said:
"It appears that the accused, while sitting in a dance hall where there were a number of people, had a pistol in her lap, unseen by others, which she was handling. Whether she had the pistol for the purpose of shooting C., who was in the hall, as charged in the first count of the indictment, or had the pistol to take care of for another person, is not material, since it is evident that her possession and handling of the pistol at the place and under the circumstances was culpable negligence, if not unlawful; and the discharge of the pistol killed the child Bernice McCoy, who happened to be passing in front of the accused while she was with culpable negligence handling the pistol that was concealed in her lap."
Again, the supreme court, in a more recent case, Tipton v. State, Fla. 1957, 97 So.2d 277, held that criminal responsibility for manslaughter should be determined by consideration of the act which resulted in death in its surroundings at the time of its commission and not consideration of the result alone.
We therefore consider the act of Getsie leading to the death of his wife in its physical and factual surroundings at the time of its occurrence rather than giving consideration alone to the result. As opposed to the facts and circumstances of the Williams case, the place was the livingroom of Getsie's apartment on the day after Christmas; there were present only himself *683 and his wife; Jean had been playing with one of her Christmas gifts from Getsie, Getsie picked up the gun which lay under the Christmas tree as a gift from his wife. His possession of the gun was both legal and in line with his work as an auxiliary policeman. He was not concealing it but was openly and proudly admiring and testing it and showing it to his wife, seeing how it worked. He had had experience with and some training in the safe handling of weapons and stated then and there that he knew what he was doing with a gun, that he was careful, and that nothing could happen. Unlike the situation in Williams, where the circumstances emerged, not through the defendant's version alone, but also through testimony of others who were present at the time and whose testimony was opposed to and in large part contradictory of that given by the defendant, Getsie's conviction was the product of his own undisputed narrative.
The State points to Getsie's testimony that, when he went to sit on Jean's lap and she extended her right arm as he held the gun, he believed he had the gun up against her and it went off; but the State also mentions Getsie's testimony that he was holding the gun about a foot and a half away from his wife at the time. Further, the prosecutor requested that Getsie demonstrate how he held the gun as he walked toward his wife; and, upon the demonstration, the prosecutor queried:
"Q The way you have got it pointed there is not  you had it pointed straight ahead when you were walking toward her?"
Getsie's response was:
"A No, sir, I believe the gun was like this when I was walking toward her. Like this. And she was sitting this way, and I went to sit down in her lap, and the gun went off."
From other states, there are three cases which may be mentioned for comparison, State v. Honeycutt, 1959, 250 N.C. 229, 108 S.E.2d 485; Peay v. Commonwealth, 1918, 181 Ky. 396, 205 S.W. 404; and Commonwealth v. Bouvier, 1944, 316 Mass. 489, 55 N.E.2d 913, involving convictions of manslaughter where death had resulted from a gunshot wound inflicted by each of the defendants.
In the North Carolina case of State v. Honeycutt, the defendant was tried upon an indictment charging him with unlawfully and feloniously slaying a certain young lady. The evidence indicated that the defendant, home on leave from the Army, had carried his gun to the front porch and was looking at it for rust spots. He checked the gun, ejected a shell, then picked up the shell and reloaded the gun. Meanwhile, defendant's betrothed, who was visiting in the home, walked out on the porch and was standing with defendant's 9 year old sister near the steps. After looking for a bird and aiming at a pear in a pear tree, defendant "went to lower the gun", turned to his left to go to the steps, hit a porch post with the end of the gun barrel. The gun discharged and wounded his fiancee. Defendant and his parents took her to the hospital, but she was dead upon arrival. The testimony tended to show that the deceased and members of his family were on the best of terms, that defendant's character and reputation were good, and that he and the deceased were in love and had planned to be married. The Supreme Court of North Carolina, in reversing the defendant's conviction of involuntary manslaughter, found no evidence that the gun was handled so recklessly as to constitute culpable negligence.
In the Kentucky case of Peay v. Commonwealth, the defendant was charged with murdering his wife, who died of a gunshot wound inflicted as defendant was unloading a pistol in his mother's home on Christmas Day. While defendant was working with the pistol, its barrel was pointed downward; but the mechanism did not work smoothly, and in an effort to get the shells from it one of them exploded, striking the *684 defendant's wife who, with his mother, was sitting in the room. No ill feeling was shown to have existed, but the relationship of defendant and his wife was affectionate. Upon her being wounded, defendant immediately sought a telephone, called a physician, did what he could to alleviate his wife's suffering. The court expressed the view that in every accident there is present some element of carelessness or negligence and that the carelessness or negligence necessary to convert the accident from an innocent into a guilty one must be under such circumstances as to indicate a disregard on the part of the perpetrator for the safety of others. It found no such circumstances in that case and concluded that the court should have directed the jury to acquit the defendant.
In the Massachusetts case of Commonwealth v. Bouvier, the defendant, charged with murder of her husband, was found guilty of manslaugher. As the only eyewitness, the defendant, an expectant mother at the time of the incident in question, testified that her husband left for a hunting trip on a certain day. He took with him a borrowed double barreled shotgun, saying to her he would not use his single barreled shotgun, which he had taken upstairs upon the preceding day for cleaning. The husband returned on the following day; and, upon the defendant's offer to prepare supper for him, he said he would go "down street" for supper and would return shortly after 8:00. He returned around 2:30 a.m.; defendant was awake and heard him mumbling. She "mistrusted that he had been drinking." After he had gone upstairs where his bedroom was located, defendant heard sounds indicating he had gone to bed. About 15 or 20 minutes later, she went upstairs to the bathroom, saw her husband in bed in his room, asleep and breathing heavily. In the corner of the room she saw deceased's single barreled shotgun, with the barrel leaning against the wall. Defendant had noticed the gun in the room twice on the preceding day and knew her husband "kept shells" in the room; also, immediately before going on his hunting trip, deceased had cautioned defendant to "Keep the kids away from upstairs," although he had never before given a similar warning. Defendant narrated that, after going to the bathroom, she stepped into her husband's room, "went to take his gun out," noticed his clothes in a pile, kicked them aside, and "took hold of the gun." All she remembered was "I went to turn, and as I turned, I bumped something, and the gun went off * * *." The court said, that while defendant's conduct could have been found properly to have been negligent, it could not be said to have approached in character the wanton or reckless conduct essential to a finding of involuntary manslaughter; also that whether the conduct of the defendant was wanton or reckless was determinable by the conduct itself and not by the resultant harm. Observing that the conduct must be determined upon the defendant's own testimony, the court found it could not properly have been found on such testimony that the discharge of the gun was other than accidental. It held that the defendant's motion that the judge direct the jury to return a verdict of not guilty of manslaughter should have been granted and so reversed the judgment, set aside the verdict, and remanded the case to the trial court.
A defendant's version of a homicide cannot be ignored where there is absence of other evidence legally sufficient to contradict his explanation. Mayo v. State, Fla. 1954, 71 So.2d 899. It should be emphasized that there is no testimony as to what happened at the time of the incident other than that of Getsie; and the State rests its case solely upon the account which he gave. We do not feel that the evidence measures up to that standard of negligence such as would constitute the offense proscribed by section 782.07. The lower court erred in its failure to grant the defendant's motion for new trial. Accordingly, the judgment *685 of conviction is hereby reversed and the cause remanded for new trial.
Reversed and remanded.
SMITH, C.J., concurs.
WALDEN, J., dissents.
WALDEN, Judge (dissenting):
I respectfully dissent.
The single simple question before us is whether or not the evidence of defendant's conduct in causing the death of his wife was sufficient to support defendant's conviction of manslaughter through culpable negligence. Of course the pragmatic answer to be found in this court depends upon the subjective interpretation and reaction of the several judges to the uncontradicted chain of events reflected in the record.
Approaching the case, it is noticed that the trial jury heard the evidence and was duly charged as to the law to include the definition and ingredients of manslaughter by culpable negligence. It found the evidence sufficient to support conviction as attested by its verdict. It is further noted that the sufficiency of the evidence was challenged before the trial judge via motion for new trial and that, by his denial, the evidence was judicially deemed sufficient to support the manslaughter conviction.
With the foregoing posture, what is our appellate function? We are limited to an examination of the record to determine if there is sufficient evidence to support the verdict, and we need only find substantial competent evidence in its support for us to sustain it. Crum v. State, Fla.App. 1965, 172 So.2d 24. We also note that the verdict and judgment of guilt arrived in this court cloaked with a presumption of correctnesss, and we are required to resolve all inferences to be drawn from the evidence in favor of the verdict and adjudication of guilt. In other words, an appellate court must assume that the fact-finders believed the credible testimony most damaging to the defendant and drew from the facts established those reasonable conclusions most unfavorable to him when reviewing a judgment of conviction. Parrish v. State, Fla.App. 1957, 97 So.2d 356; Crum v. State, supra; Spataro v. State, Fla.App. 1965, 179 So.2d 873.
From my examination of the record, using these rules and in the light of the further comments herein made, I am unable to find any basis for disturbing the judgment of conviction. See Johnson v. State, Fla.App. 1958, 101 So.2d 180; Lee v. State, Fla.App. 1963, 153 So.2d 351.
The fatal happenings are reflected in a written confession which was given by the defendant on the same day and immediately following the shooting. This confession was admitted in evidence. The defendant testified at trial some months later. He testified about the confession in some detail and attempted in some instances to qualify answers.
What actually happened?
The gun in question was a Colt .357 Magnum, six shot revolver. It was fully loaded with six cartridges and this fact was known to the defendant.
The defendant was not a novice, but was trained and familiar with the use of firearms and with revolvers in particular.
Material portions of the defendant's sworn confession as to the happenings are here extracted verbatim. This is the evidence which the jury and trial judge were entitled to consider and rely upon in making their respective decisions. It is evidence that we must consider in the performance of our appellate function. Defendant confessed:
"* * * I picked up the gun that was in my new holster that was like a Christmas present * * *. So my wife went over and sat in the chair by the front door and then I went over there and I sat down on her lap or leg. So I had the gun in my right hand and I was *686 pulling the hammer back and pulling the trigger to release the hammer and rotating the cylinder. She said, `Jack, you shouldn't be playing with gun like that in the house.' I said, `Oh, nothing can happen, I'm careful and know what I'm doing with a gun.' So just then  I was still pulling the hammer back and clicking it  it went off, I dropped it on the floor and I looked and saw the blood on her left shoulder or neck * * *.
* * * * * *
"* * *
"Q  Did you realize that the gun was loaded when you were fooling with it?
"A  Yes sir * * *.
"Q  How long have you had this gun?
"A  I think about a month.
* * * * * *
"* * *
"Q  Where were you pointing the gun?
"A  At her  that's what was making her so nervous.
"Q  Why were you pointing it at her?
"A  No reason  I was just holding it  more or less just showing off with it * * *.
"Q  How far from your wife was the muzzle of this gun?
"A  Maybe 6" or 1 foot.
"Q  Did she ask you to stop fooling with the gun near her?
"A  Yes sir.
"Q  Did you stop?
"A  No sir, I didn't and that's when it went off * * *.
"Q  And you realized while you were doing this fooling with the gun, that it was loaded?
"A  Yes sir I did * * *.
"Q  How many times during this fooling had you `cocked' and released the hammer?
"A  Maybe a half a dozen times  it was fairly fast.
"Q  How long were you on your wife's lap after you took the gun from under the tree?
"A  Just about a minute  maybe a couple minutes * * *.
"Q  Did you know that she was afraid of the gun?
"A  Yes sir.
"Q  Were you trying to impress her or show off?
"A  Yes sir * * *."
It is noted that the bullet struck the palm of the wife's left hand, entered the left side of her neck, passed through her gullet and lodged in her lung.
It is difficult, if not impossible, for this writer to conceive of a more culpably negligent course of conduct than that tracked by the defendant in the instant case. Without the merest excuse of cleaning, repairing or any other legitimate purpose in the handling of the lethal weapon, this gun-wise defendant sat in his wife's lap and deliberately pointed the loaded gun at his wife and operated its mechanism in order to impress her and show off. He deliberately cocked and pulled its trigger about six times. The normal effect of this is to cause the hammer to go forward and cause the firing pin to strike and fire the cartridge in the chamber. However, this defendant placed his thumb or finger on the hammer and eased it down, thus preventing the cartridge explosion, at least until the fatal shot was fired. This sequence might be likened to a game of Russian Roulette with someone else's body as the target.
For these reasons, I do respectfully record this dissent.