509 So.2d 953 (1987)
Josephine TUFF, Appellant,
v.
STATE of Florida, Appellee.
No. 4-86-1436.
District Court of Appeal of Florida, Fourth District.
May 27, 1987.
On Motion for Rehearing July 29, 1987.
Victor Tobin of Victor Tobin, P.A., and Evelyn Merchant, Fort Lauderdale, for appellant.
Robert A. Butterworth, Jr., Atty. Gen., Tallahassee, and Deborah Guller, Asst. Atty. Gen., West Palm Beach, for appellee.
GLICKSTEIN, Judge.
A jury found appellant Josephine E. Tuff guilty of manslaughter by culpable negligence with a firearm in violation of section 782.07, Florida Statutes, and the court adjudicated accordingly. We reverse and remand for new trial, choosing to discuss only two of the three points which we duly considered.
Appellant was the mother of the decedent, George Tuff. They resided at 973 Northwest 27th Avenue, Fort Lauderdale with Mrs. Tuff's daughter, Lashauna Tuff, and the daughter's friend, Cheryl Mullins.
On December 31, 1984, Mrs. Tuff, her son George, her daughter Lashauna, and Cheryl Mullins were going to celebrate the New Year at Mrs. Tuff's parents' home in Boca Raton. Prior to leaving for her parents' home, George Tuff asked whether he could take a revolver along. Mrs. Tuff told him that he could not take the gun. George, aged 16, wanted to shoot the gun off on New Years with his friends. This was what they had been talking about doing on New Years. Mrs. Tuff advised George "it was dangerous" and "that ... he shouldn't be shooting a gun." George was upset that he was not allowed to take the gun.
Prior to leaving for Boca Raton, Mrs. Tuff moved the gun from the desk drawer in her bedroom to the couch on the back porch. She did this because she believed if George came back in the house, the one place he would look for the gun would be in her desk drawer.
Upon returning from Boca Raton, George began asking where the gun was. George then began putting things out of *954 his room, including the girls' bedding. He began "throwing a temper tantrum." This tantrum included slamming doors and shouting. Then there was silence.
During this period, Mrs. Tuff was straightening up the house. While sweeping the porch she went to retrieve the gun from the couch, and put it in her pants under an over-blouse. No one in the house was aware she had retrieved the gun. Friends came by and asked George if he was going to shoot for New Years. He replied "he didn't know where it was."
Mrs. Tuff said it was her intent to carry the gun to her room and put it away. First, however, she detoured to the bathroom. At that time, George was ranting and raving and throwing everything out of his room. She instructed him to stop. She again told him about the danger related to the gun. Then he made an "advancement towards her." She responded by pushing the broom handle she had been sweeping with at him. George apparently grabbed the broom and pushed it back towards Mrs. Tuff. She then backed out of the room. Mrs. Tuff stated that she was upset that George would not accept the fact that she would not let him take the gun. This argument was described by family members and Cheryl Mullins as normal, and not loud and violent. At this point Mrs. Tuff realized she still had the gun on her person. George closed the door, and Mrs. Tuff went towards the back porch. Next, Mrs. Tuff had the gun in her hand and was heading towards her room to put the gun away. The girls were unable to see her at that point. She leaned down to pick up something that had been thrown out of the room. She stated she was talking and talking and shaking the gun in her right hand and a garment in her left hand, and "the gun goes off." She testified she could hear loud breathing. She opened the door and screamed "Oh my god, oh my god." "I think George has been shot." "I think he's been shot." "Oh my god, oh my god." She then immediately called 911. She in fact called 911 numerous times.
Mrs. Tuff stated that when the gun fired she had no idea where George was in the room. The door to George's room was closed when he was shot. The bullet traveled through the door and hit George in the head. Mrs. Tuff described this incident as "a freak accident, like a nightmare or something." "I don't know why."
The two issues (restated) which we choose to discuss are the following:
I. Whether the conviction was improper because there was insufficient evidence of manslaughter by culpable negligence. We conclude it was not although the evidence is far from overwhelming.
II. Whether there was prejudicial or inflammatory comment by the prosecuting attorney during closing argument. We conclude there was because the evidence against appellant was borderline in its sufficiency, and these remarks could have tipped the scales.

I

SUFFICIENCY OF THE EVIDENCE
Appellant contends that the conduct she was shown by the evidence to have engaged in was no more than ordinary negligence, and therefore she could not properly be convicted of manslaughter by culpable negligence.
In Getsie v. State, 193 So.2d 679, 682 (Fla. 4th DCA 1966), this court cited Tipton v. State, 97 So.2d 277 (Fla. 1957), for the principle that "criminal responsibility for manslaughter should be determined by consideration of the act which resulted in death in its surroundings at the time of its commission and not consideration of the result alone."
In the instant case, Mrs. Tuff was having an argument with the son, who had wanted to take the gun to shoot it off while celebrating New Years. We conclude that there is an important difference from the facts of Getsie and foreign cases cited there, in that in those the defendants and the victims were uniformly on good terms with each other. Here the son was having a tantrum, and was throwing things out of his room and into the hall. The mother had earlier hidden the gun on the porch to prevent the son from taking it. She had *955 now retrieved it and was carrying it back to its normal location in her bedroom. There was a slight scuffle between mother and son. She was in the hall in front of the now closed door of the son's bedroom. She picked up a garment from the floor that he had thrown out the door. She was admonishing her son and gesticulating with both hands. The gun, which was in one hand, went off; the bullet went through the door. The son was evidently just inside the room, and the bullet hit him in the head.
Very little directly relevant information came from anyone but appellant herself. The other members of the household were not in a position to see exactly what happened. There were police theories that George was directly behind the door pushing it or leaning against it, with his head down, and that Mrs. Tuff fired in the direction of the door in anger. These were unsubstantiated opinions. The officer with the theory George was leaning against the door reasoned this from the fact the bullet descended through George's head. The medical examiner, however, said the trajectory of the bullet was deflected when travelling through the door, and that explained its route when it hit George. There was no factual support for the police theories; they were just theories.
In the present case, the facts tend to fit more closely the cases supporting conviction than the cases supporting appellant, mainly in respect to the fact appellant admits to having had an ongoing argument with the victim including, apparently, a shoving match involving the broom she was using, just before the discharge of the weapon. We are nevertheless empathetic to the fact the argument was over the fact the boy wanted to shoot the gun and the mother would not let him because of the danger.

II

PROSECUTORIAL MISCONDUCT
Appellant contends during closing argument the prosecutor made several remarks that were prejudicial. Several of these remarks describe ordinary negligence, rather than culpable negligence, and suggest, by implication, this is the test in the present case. The prosecutor also indicated the judge would speak similarly. Hence, says appellant, the prosecutor conveyed that if Mrs. Tuff did not use reasonable care, she was guilty.
Next, Mrs. Tuff urges that the prosecutor's Golden Rule argument, his reference to a parent's responsibility to keep his or her children safe, and his mention of the number of children each juror had (who had children), mentioning each juror by name, was inflammatory. The prosecutor also allegedly indicated Mrs. Tuff was a menace to the jurors' children.
Next, appellant argues that the prosecutor argued facts not in evidence by saying, "If the thing is not cocked, and I ask you if it was cocked, what was it doing cocked?"
Finally, appellant attacks the prosecutor's statement that Mrs. Tuff was told of her right to remain silent and her right to the presence of a lawyer  appointed, if necessary  because the officers know defense lawyers are sharp enough to claim the client was not given a lawyer. This, she urges, is a distortion and an unfair attack on defense counsel.
Mrs. Tuff admits no objections were raised to these comments at trial, but urges they individually and cumulatively amount to fundamental error, thus justifying reversal anyway.
The state is correct in saying the appellant's failure to object and failure to raise prosecutorial misconduct as grounds for seeking a new trial in her motion for new trial may be viewed as waiver of objection. See Clark v. State, 363 So.2d 331, 335 (Fla. 1978).
In Ryan v. State, 457 So.2d 1084, (Fla. 4th DCA 1984), this court reversed a conviction because of prosecutorial remarks about the defendant's wealth and manipulative nature, the prosecutor's personal attacks on defense counsel, comment on facts not in evidence, and comment on the defendant's failure to testify.
This court said in Ryan that prosecutorial misconduct amounts to fundamental error, *956 and is excepted from the contemporaneous objection/motion for mistrial rule, when the prosecutor's argument, taken as a whole, is of such character that its sinister influence could not be overcome by rebuke or retraction. Id. at 1091. The Ryan court said also that "[i]n a close case ... where the jury is walking a thin line between a verdict of guilt and innocence, the prosecutor cannot be allowed to push the jury to the side of guilt with improper comments such as these." Id.
The present case was a close one. Although the comments here were not as extreme as those in Ryan, they could have pushed the jury to the side of guilt, though this was not a necessary result.
GUNTHER, J., concurs.
LETTS, J., concurs specially with opinion.
LETTS, Judge, concurring specially.
I arrive at the same result by a totally different route.
In my view, since Getsie apparently is still the law, much though I dislike it, the case before us now should not have gone to the jury. The majority appears to distinguish Getsie because here the mother and son were having an argument and possibly a shoving match. Such family behavior is commonplace and seldom is associated with the expectation of gunfire. On the other hand, many homicides committed on unsuspecting victims do not involve arguments at all. Sub judice, the gun was not placed next to the victim's head and the hammer playfully cocked (as in Getsie), it was fired through a door and only hit the victim because the bullet was deflected. If the evidence in the Getsie case was not deserving of jury consideration then, a fortiorari, it was insufficient in the case at bar.
As to the prosecutorial misconduct, while I do not condone it, the lack of an objection would appear to me to settle the matter in favor of the State. The remarks, in my opinion, do not constitute fundamental error. The most noteworthy prosecutorial transgression was the recital of the wrong standard of negligence required. That erroneous statement of the law was cured by the proper jury instruction. Absent objection, an inaccurate statement of the law, later corrected by the judge, does not, under the facts of this case, constitute fundamental error.

ON MOTION FOR REHEARING
GLICKSTEIN, Judge.
While we deny the state's motion for rehearing, we acknowledge that the test to be used, in the absence of objection to alleged prosecutorial misconduct, is whether the prosecutor's comments are fundamentally tainted. See Rhone v. State, 93 So.2d 80 (Fla. 1957); Abbott v. State, 334 So.2d 642 (Fla.3d DCA 1976).
We hold to our conclusion but respond to the urging of the state and eliminate the last two paragraphs of our original opinion out of concern that we needlessly mix apples and oranges; namely, fundamental and harmless error.
GUNTHER, J., concurs.
LETTS, J., dissents without opinion.