711 So.2d 1159 (1998)
Timothy COCHRAN, Appellant,
v.
STATE of Florida, Appellee.
No. 97-0189.
District Court of Appeal of Florida, Fourth District.
March 18, 1998.
Rehearing Denied April 20, 1998.
*1160 Patrick C. Rastatter of Glass & Rastatter, P.A., Fort Lauderdale, for appellant.
Robert A. Butterworth, Attorney General, Tallahassee, and Carol Cobourn Asbury, Asst. Atty. Gen., West Palm Beach, for appellee.
PER CURIAM.
Appellant, Timothy Cochran (defendant), appeals his conviction of second degree murder after a jury trial. The conviction arose out of an incident where the defendant shot his wife's brother, Mitchell Szymanski. We reverse because the prosecutor's remarks during closing argument warrant a new trial.
This was a close case. At trial, the defendant asserted defenses of either accident or self-defense. He contended that the shooting occurred while he and his wife were trying to push Szymanski from a foyer out the front door of their home. Szymanski was a crack cocaine addict who had previously been banished from the Cochrans' home because of his conduct while under the influence of drugs. The state relied on expert testimony, physical evidence, and discrepancies in statements to dispute the defense depiction of the incident and to argue that the shooting did not occur in the foyer, but when Szymanski was outside the home, not posing an immediate threat to the defendant or his wife.
The state called the defendant's wife, Kim Cochran, to provide her eyewitness account of the shooting of her brother. She testified that when her brother appeared at her home, she and her husband were sitting on the back of their truck drinking beer. Szymanski told them that "he was out to kill somebody." The defendant went into the house while his wife talked to her brother outside. He wanted to spend the night inside the home, but his sister reminded him that he was not allowed inside because he and the defendant had gotten into a fight the previous year, where Szymanski had been the aggressor.
Mrs. Cochran went into the home to get her brother a blanket. Just inside the door to the house was a small foyer, which led to the living room and kitchen. She saw the defendant approaching the couch in the living room. A gun was lying on the table next to the couch.
Szymanski stepped into the house behind his sister, saying, "I want to talk to [the defendant]." Mrs. Cochran told her brother that he did not need to talk to her husband. She did not see her brother with any weapons.
When Szymanski saw the gun in the living room, he began to taunt the defendant in a "raging" voice. Szymanski said, "You are really macho, you think you are macho with that gun." The defendant replied, "I don't think I'm macho, Mitch. I don't think I am and if I thought I was so macho I wouldn't have a gun, I wouldn't have to have a gun, I'm scared of you, I've seen you on crack before, Mitch."
Szymanski and Mrs. Cochran started pushing and shoving each other. The defendant picked up the gun. From the living room, the defendant fired a shot into the air. When the warning shot went off, Mrs. Cochran was able to push Szymanski backwards. Szymanski then became more aggressive. Mrs. Cochran said that her husband came to her aid by getting behind her, trying to help her shove Szymanski out the front door.
During this struggle, a second shot was fired. Mrs. Cochran claimed that at the time of the shot, she and her brother were both in the foyer. Mrs. Cochran testified that Szymanski was "standing in between me and my arms. I had him in my two arms and we were shoving back and forth." Szymanski's back was to the front door and he was facing *1161 the defendant. After the shot, Szymanski "buckled" and his sister fell out the front door with him. Mrs. Cochran was "covered with blood." None of the objects in the foyer were damaged during the struggle, although the police later found debris on the floor which looked like particles of plaster. Mrs. Cochran "assumed" that the shots were fired 2-3 feet from where she and her brother were struggling.
There was a conflict in the evidence over whether there was any blood in the foyer. A detective observed none. A neighbor testifying for the defense said that when he went into the home the day following the shooting, he observed blood stains inside the front door on the tile. The police found one spent cartridge case in the living room and one in the foyer.
The state impeached Mrs. Cochran by introducing two statements given to the police after the shooting. In neither statement did she state that her husband had pushed her and Szymanski.
The state called a forensic pathologist to testify concerning the results of the autopsy he had conducted. In Szymanski's blood, the doctor detected a compound that the body produces when one is binging on cocaine. He noted that the bullet entered the left cheek near the bottom of the earlobe and exited at the middle of the head. The doctor "saw no evidence that the gun was within 2 or 3 feet from the face" at the time of the discharge because he saw no stippling on the deceased's skin.
The pathologist testified that once shot, Szymanski would not have been able to conduct any muscular functions, but would have fallen to the ground. If Szymanski were standing when shot, he would have fallen the way he was leaning when shot; if he were in motion, he would have fallen in that direction. The doctor opined that blood loss would begin to rapidly accumulate in less than a second at the area where a person is located after he is shot. Within seconds of the gunshot in this case, the doctor would have expected blood to be in the vicinity of Szymanski's head.
Witnesses testified to both the defendant's and Szymanski's reputations for peacefulness. For example, Linda Szymanski, the deceased's ex-wife, testified that she never witnessed any acts of violence by the deceased; however, she also stated that when he was on crack cocaine he would exhibit a short fuse and become violent. Witnesses indicated that after he became addicted to crack, Szymanski often was verbally abusive and threatening even to members of his own family.
The defense introduced testimony concerning the defendant's longstanding anxiety disorder, for which he took medication, the existence of marks and bruises on Mrs. Cochran's body after the altercation with the deceased, and a prior consistent statement Mrs. Cochran made to the police about the defendant assisting her in attempting to push Szymanski from the house. The defense called Mary Gotero, who observed the incident from her bathroom window as she smoked a cigarette. During the altercation, she heard Mrs. Cochran complain of being hurt and both Cochrans yell at someone to leave their home. After Gotero heard two gunshots, she saw Mrs. Cochran and her brother come from within the front door entrance to the outside of the home. The defendant testified that after he fired the warning shot, he ran to his wife's assistance and shoved her as hard as he could, while she was pushing her brother out of the residence. He claimed that while he was pushing, the gun in his hand discharged.
The defense timely moved for judgment of acquittal. The trial judge reserved ruling. After the jury's verdict, he denied the motion with a lengthy discussion of the evidence. Noting that the physical evidence contradicted the defense version of the shooting, the trial judge stated,
[The jury] drew an inference that the blood showed to them that the shooting occurred outside. Not inside as the defense asserted. They must have. I think they must have had to draw the inference that the kind of struggle that the defense raised to the jury did not occur inside where the struggle was an accidental shooting or shooting in self-defense, because *1162 everything was undisturbed and you gave an explanation for why it was undisturbed and that's up to the jury to decide how they want to decide that.... There was evidence of ill-will, spite. The weight to be assigned by the jury. The jury could have easily decided that in a moment of rage the defendant fired that shot. He may have had remorse immediately afterwards, but he fired the shot in anger or hatred. That he was fed up, that was the testimony of the defendant. That he was fed up with the taunting. The State's theory to the jury is that he lost control of his emotions and fired the shot in ill-will.
There was the evidence to support that. The evidence at the scene of the blood outside the door. The undisturbed items inside the home. That the defendant knew the gun was loaded. He fired one warning shot, so he knew he had a loaded weapon.
The jury could have found that the blood that was on the wife was inconsistent with her testimony as to her pushing her brother out the door. The jury could have found what she testified to was not totally correct. That maybe she wasn't where she said she was, because why did she get so much blood on her.
That if she was pushing him out the door and the bullet whizzed by her and the blood spurted out the back of the deceased's head, most of the blood would have been away from her. But she was covered in blood. The jury could have drawn an inference that she was not where she said she was.
That she was outside the home. That the deceased was outside the home at the time of the shooting and she indirectly got blood on her, not because she was pushing him out, but because she was already out the door and may have [given] the final push and stepped aside when her husband shot him.
Again, this is a contrary inference, but it's up to the jury to draw whatever inference from the facts they saw in the record. The State presented competent evidence on their side of the case. Therefore, your motions are hereby denied.
The test to be applied on a review of an order denying a motion for judgment of acquittal is "not simply whether in the opinion of ... the appellate court the evidence fails to exclude every reasonable hypothesis but that of guilt, but rather whether the jury might reasonably so conclude." Green v. State, 408 So.2d 1086, 1089 (Fla. 4th DCA 1982) (citation omitted). "When a defendant moves for a judgment of acquittal, he admits all facts adduced in evidence and every conclusion favorable to the state that a jury might reasonably and fairly infer from the evidence." Scott v. State, 693 So.2d 715, 716 (Fla. 4th DCA 1997) (citation omitted). Reviewing the reasons articulated by the trial judge in his ruling, we find no error in the denial of the motion for judgment of acquittal.
Defendant next argues that reversal is required because the cumulative effect of errors in the prosecutor's closing argument amounted to fundamental error. Viewed as a whole, the prosecutor's argument was an appeal to the jury to decide the case on an emotional basis, rather than a rational review of the evidence under a rule of law. The supreme court described the proper parameters of a prosecutor's closing argument in Bertolotti v. State, 476 So.2d 130, 134 (Fla.1985):
The proper exercise of closing argument is to review the evidence and to explicate those inferences which may reasonably be drawn from the evidence. Conversely, it must not be used to inflame the minds and passions of the jurors so that their verdict reflects an emotional response to the crime or the defendant rather than the logical analysis of the evidence in light of the applicable law.
The prosecutor argued that any verdict other than a conviction would be to establish a "one free murder rule" in the community. It is improper for a prosecutor to infer to the jurors that a conviction will serve some larger social good, beyond the confines of the trial. See, e.g., Pacifico v. State, 642 So.2d 1178, 1182 (Fla. 1st DCA 1994). The prosecutor improperly resorted to personal attacks on defense counsel and the defendant. See, e.g., Ryan v. State, 457 So.2d 1084, 1089 (Fla. 4th DCA 1984); Pacifico, *1163 642 So.2d at 1183; Fuller v. State, 540 So.2d 182, 184 (Fla. 5th DCA 1989); Redish v. State, 525 So.2d 928, 931 (Fla. 1st DCA 1988). The prosecutor improperly expressed his personal belief as to the witness's credibility and the defendant's guilt. See, e.g., State v. Ramos, 579 So.2d 360, 362 (Fla. 4th DCA 1991); Pacifico, 642 So.2d at 1183-1184. The prosecutor improperly commented on matters outside the evidence. See, e.g., Spencer v. State, 645 So.2d 377, 383 (Fla.1994). Finally, the prosecutor improperly referred to Szymanski's "little child" to appeal to the sympathy of the jury. See, e.g., Breniser v. State, 267 So.2d 23, 25 (Fla. 4th DCA 1972); Edwards v. State, 428 So.2d 357, 359 (Fla. 3d DCA 1983); Knight v. State, 316 So.2d 576, 578 (Fla. 1st DCA 1975).
Taken individually, in a different case, the prosecutor's comments may not have been so egregious as to warrant reversal. However, the remarks must be viewed cumulatively in light of the record in this case. Here, the improprieties in the prosecutor's closing argument reached the critical mass of fundamental error, which the supreme court has defined as error that "reach[es] down into the validity of the trial itself to the extent that a verdict of guilty could not have been obtained without the assistance of the alleged error." Kilgore v. State, 688 So.2d 895, 898 (Fla.1996) (quoting from State v. Delva, 575 So.2d 643, 644-45 (Fla.1991)), cert. denied, ___ U.S. ___, 118 S.Ct. 103, 139 L.Ed.2d 58 (1997). Taken as a whole, the final argument was "such as utterly to destroy the defendant's most important right under our system, the right to the `essential fairness of [his] criminal trial.'" Knight v. State, 672 So.2d 590, 591 (Fla. 4th DCA 1996) (quoting from Peterson v. State, 376 So.2d 1230, 1234 (Fla. 4th DCA 1979)); see also Rhodes v. State, 547 So.2d 1201, 1206 (Fla. 1989); Tuff v. State, 509 So.2d 953, 955-56 (Fla. 4th DCA 1987); Thompson v. State, 318 So.2d 549, 551 (Fla. 4th DCA 1975); Fuller, 540 So.2d at 184-85.
In 1923, the supreme court set forth the standard of prosecutorial conduct in a criminal trial:
[E]xcessive vituperation or ridiculous epithets are out of place and should not be indulged in criminal prosecutions. The prosecuting attorney occupies a semijudicial position. He is a sworn officer of the government, with no greater duty imposed on him than to preserve intact all the great sanctions and traditions of the law. It matters not how guilty a defendant in his opinion may be, it is his duty under oath to see that no conviction takes place except in strict conformity to law. His primary considerations should be to develop the facts and the evidence for the guidance of the court and jury, and not to consider himself merely as attorney of record for the state, struggling for a verdict.
Washington v. State, 86 Fla. 533, 98 So. 605, 609 (1923). In a similar vein, the United States Supreme Court wrote in Berger v. United States, 295 U.S. 78, 88, 55 S.Ct. 629, 633, 79 L.Ed. 1314 (1935), that a prosecutor is
the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done. As such, he is in a peculiar and very definite sense the servant of the law, the twofold aim of which is that guilt shall not escape or innocence suffer. He may prosecute with earnestness and vigorindeed, he should do so. But, while he may strike hard blows, he is not at liberty to strike foul ones. It is as much his duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one.
It is fair to say that the average jury, in a greater or less degree, has confidence that these obligations, which so plainly rest upon the prosecuting attorney, will be faithfully observed. Consequently, improper suggestions, insinuations, and, especially, assertions of personal knowledge are apt to carry much weight against the accused when they should properly carry none.
*1164 These standards of conduct set in an earlier generation are equally applicable today.
REVERSED AND REMANDED.
DELL and GROSS, JJ., and OWEN, WILLIAM C., Jr., Senior Judge, concur.