752 So.2d 19 (2000)
Stanley M. QUAGGIN, Appellant,
v.
STATE of Florida, Appellee.
No. 5D98-2447.
District Court of Appeal of Florida, Fifth District.
January 14, 2000.
Rehearing Denied March 1, 2000.
James T. Miller, Jacksonville, for Appellant.
Robert A. Butterworth, Attorney General, Tallahassee, and David H. Foxman, Assistant Attorney General, Daytona Beach, for Appellee.
PER CURIAM.
Stanley Quaggin appeals his manslaughter conviction and sentence of fifteen years in prison followed by five years of probation. We agree with Quaggin that the cumulative effect of several errors requires *20 reversal for a new trial.[1]
Mid-afternoon on March 16, 1997, fourteen-year-old Eric Brooks was shot and killed by seventy-six-year-old Quaggin in Quaggin's DeLand home. Eric and a friend, ten-year-old Jon Eidelbach, had been playing nearby and ventured onto Quaggin's property, eventually entering Quaggin's home through a sliding glass door. Quaggin was sitting in a chair in the room entered by the boys and he stood up and shot Eric, allegedly in self-defense or in the belief that Eric was a burglar.
By all accounts, Quaggin's property both inside and outis cluttered with piles of junk. The land around Quaggin's house contains several trailers, old parade floats (which Quaggin built), and other items. According to Jon, he and Eric were playing outdoors while his father worked at a nearby warehouse. They found some wood on Quaggin's property which they were interested in using to build a fort in the woods. They did not take the wood; rather, they assumed someone lived there and wanted to ask the owner if they could have the wood. The boys entered a few of the trailers on the propertywithout knocking firstand picked up a cooler bag, some comic books, and some Pez candy dispensers, planning to ask the owner for permission to take these items. A radio was playing near the woods, not far from a gazebo which housed a running refrigerator. The refrigerator contained beer and Coca-Cola; the boys took nine Cokes from the refrigerator and put them in the cooler bag, intending to ask whoever lived there if they could have them.
Jon explained that they came upon a blue door which was held slightly open by a brick or cinder block. Without knocking and without obtaining permission to go inside, they opened the doorpulling it open and sliding the cinder block away and proceeded down a junk-lined hallway which left "just a little enough path to get through." Eric ventured into some of the rooms off the side of the hallway looking for more stuff, but Jon intended only to ask for the wood and then leave. They reached some dirty sliding glass doors and saw a light on inside; according to Jon, the light made them believe even more strongly that someone might be there. One of them opened the sliding glass doors again, without knockingand they went inside. The first thing Jon saw was "[a] light and a whole pile of junk," and they could tell that they had entered a house where someone lived. Jon knew it was wrong to enter someone's house without permission.
According to Jon, Eric lifted him up so that he could look over the junk pile in the middle of the room. Jon did not see or hear anyone at that point. Eric put Jon down and the boys stood there without trying to take any of the items in the room. Next, Jon testified, "A guy jumped up and he says, `what [the] hell are you doing here,' and like maybe one second pas[sed], and he shot him. He didn't give him time to respond." Quaggin was standing over by a chair on the other side of the pile; Jon could see him once he stood up but not while he had been seated. Jon denied that either he or Eric tried to "go at" the gun or Quaggin. They did not climb on the pile or say anything back after hearing Quaggin's words; there was no time for that. After Eric was shot, he fell backward and Jon started crying. *21 Quaggin told him to climb over the pile and put his hands on top of his head, and Jon complied. Quaggin told Jon to get the telephone, and Jon did so. Quaggin then called 911 and summoned an ambulance. Eric was pronounced dead at the scene.
On cross-examination, Jon acknowledged that at his deposition he had testified that about five seconds passed between the time Quaggin got up and said the words and the time he shot Eric. Jon also acknowledged that at his deposition he stated that Eric was one yard away from Quaggin when Quaggin shot him and that they were climbing over the pile to see if anyone was there. At trial, Jon said he meant that Eric was lifting him up so he could see over the pile.
Quaggin did not testify at the trial, but during the State's case-in-chief the 911 tape and Quaggin's taped police interview were played for the jury. On the 911 tape, Quaggin told the operator he had just shot a kid in his house and to "get that ambulance here pretty fast." Quaggin told the operator Eric was "laying on the ground in my damn living room." When the operator asked Quaggin why he shot Eric, Quaggin replied, "Because he was in my place and milling around and getting ready to take the stuff out. They were stealing in other words, they were stealing. They broke into the place and they were stealing." Jon briefly spoke to the 911 operator and told her he was scared and that he and Eric "were not going to try to steal. I would never steal."
During his police interview, which was conducted a few hours after the shooting, Quaggin stated he had lived at the residence for forty-five years building parade floats. He had been in the hospital the prior week. The day of the shooting, he had gone out to get the newspaper and was sitting in his chair going through his mail from a few days earlier when "shortly, anyway, my sliding glass door came open." Quaggin was "flabbergasted" and "didn't know what was up." He was unsure as to whether perhaps someone he knew had entered his home, but then he "heard one of them tell the other one something about, get this, or get that, and they were moving some of the things." Quaggin had his pistol on the chair beside him, and he "cocked it ... and ... told them to stop where they were." Quaggin stated, "[I]nstead of stopping, he kept right on coming towards me, and in fact, at the time that I shot him, I would say he was probably about the distance from which you are, but still coming. And of course, I shot him."
Quaggin explained that when the boys first came into the house he "couldn't determine who they were, but I saw two bodies, is all I can tell you. Two bodies." Quaggin confirmed that "basically, someone came up to [his] place, opened [his] unlocked door, and walked into [his] home." He explained that he pulled the hammer back "[b]ecause I see that the one fella, I told him to stop, and he was continuing to come toward me.... And I just told him to stop. In fact, I told him to stop, I don't know, three, four times." When asked what he said when he first encountered the boys, Quaggin stated:
Probably, probably, something, what are you doing here, or something like that. And I know I surprised them, I guarantee you that ... because that, the one that I shot came right towards me, and that's when I told him, three or four times I told him to stop, and he just kept on, and I figured, I don't know about time wise, but in a matter of maybe a couple of seconds, he'd be on me, and I mean as far as his body size, he looked, you know, like a, probably a 18 or 19 year old fella. I had no idea of the age of them, or anything like that. But he looked like a grown person. So I figured, you know, the different things that had happened at my place, he wouldn't stop. So that's, of course, the reason I carry a gun. I mean, if I hadn't of done that, in my mind, things could of turned around the other way, *22 and then I would be laying down somewhere.
The person who was coming toward him could not have been trying to get out of the residence in the direction he was moving: "No, no, no, they were coming toward, away, the sliding glass doors were there, and I was over here, and they were coming right towards me. Or, they or he was."
Quaggin could not remember Eric saying anything threatening or having any type of weapon in his hands, but described Eric as "on the attack mode. In other words, he was, he wasn't going that way or that way, or backing out, so he, to me, was attacking me." Quaggin estimated that Eric was four feet away from him when he was shot. Eric was standing on some of the debris in the room at the time, so Eric was "maybe two f[ee]t higher than" Quaggin. When asked whether Eric was still moving when the shot was fired, Quaggin responded, "I believe so. But I can't you know, it's darn things happen so damn fast." Quaggin had no doubt that Eric was climbing over the pile: "He didn't stop, period. Or, go back out. You know, in other words, he was coming towards me."
Quaggin explained that his home had been broken into once previously, in 1987 when he was in Alaska. He bought the gun after that incident, "for the purpose of protection. I'm all by myself. You know. And an older gentlem[a]n. I mean, what can I do?" A sheriff's investigator confirmed at trial that a police report was on file reflecting a burglary of the residence in 1987 when Quaggin was in Alaska.
On appeal, Quaggin contends, and we agree, that the instructions to the jury were confusing and that the prosecutor misstated the law to the jury. The jury was instructed as follows on justifiable use of deadly force:
An issue in this case is whether the defendant acted in self-defense. It is a defense to the offense with which Mr. Quaggin is charged if the death of Eric Brooks resulted from the justifiable use of force likely to cause death or great bodily harm.
The use of force likely to cause death or great bodily harm is justifiable only if the defendant reasonably believes that the force is necessary to prevent imminent death or great bodily harm to himself while resisting:
1. another's attempt to murder him, or
2. any attempt to commit a burglary of any dwelling house occupied by him.
A person is justified in using force likely to cause death or great bodily harm if he reasonably believes that such is necessary to prevent
1. imminent death or great bodily harm to himself or another, or
2. the imminent commission of a burglary.
This instruction tracks the language of the standard instruction on justifiable use of deadly force. See Fla. Std. Jury Instr. (Crim.) 45. The court also instructed the jury on retreat in the home:
If the defendant was attacked in his own home or on his own premises, he had no duty to retreat and had the lawful right to stand his ground and meet force with force, even to the extent of using force likely to cause death or great bodily harm, if it was necessary to prevent death or great bodily harm to himself or the commission of a burglary of his dwelling.
(emphasis added). This language also appears in the standard instruction on justifiable use of deadly force. Fla. Std. Jury Instr. (Crim.) 49. Quaggin urges that the inclusion of the "meet force with force" languageto which he objected below[2] *23 is erroneous as to defense of burglary because "[t]he law of Florida does not require a homeowner to wait until a burglar actually uses deadly force before the homeowner uses deadly force," but rather "[a] homeowner may use deadly force, if reasonable, to stop the commission of a burglary."[3]
The State argues that considering the jury charge as a whole, the "meet force with force" language is not misleading and "[o]nly by taking this single line out of its context can it be made to appear inconsistent with the privilege to use deadly force to prevent the imminent commission of a burglary," pointing out that the jury was also instructed:
In deciding whether defendant was justified in the use of force likely to cause death or great bodily harm, you must judge him by the circumstances by which he was surrounded at the time the force was used. The danger facing the defendant need not have been actual; however, to justify the use of force likely to cause death or great bodily harm, the appearance of danger must have been so real that a reasonably cautious and prudent person under the same circumstances would have believed that the danger could be avoided only through the use of that force. Based upon appearances, the defendant must have actually believed the danger was real.
The State argues that with the inclusion of this paragraph in the instructions, the jury was properly told that all that was required to justify the use of deadly force was the reasonable appearance of danger rather than actual danger.
Quaggin is correct that although the court gave standard instructions on justifiable use of force, the manner in which the instructions were given was confusing and misleading. See Butler v. State, 493 So.2d 451, 452 (Fla.1986) (noting that "the court should not give instructions which are confusing, contradictory, or misleading"); McCoy v. State, 493 So.2d 1093, 1095 (Fla. 4th DCA 1986) (finding "that the manner in which the trial court instructed the jury on self-defense improperly shifted the focus of the instruction from the defense of self-defense to the question of whether the force used constituted a justifiable use of force likely to cause death or great bodily harm" and that "[a]lthough the difference between the instructions given by the court from those of the Standard Jury Instructions may appear insignificant when taken in the context of the entire charge, we conclude that the trial court's instruction was misleading and confusing"). The court did not point out to the jury that self-defense in the home and defense of burglary are separate, though similar, defenses. Cf. State v. Carothers, 594 N.W.2d 897, 903 (Minn.1999) (noting that "defense of dwelling and self-defense within the home claims will often blur.... When events occur in a defendant's home, the factual requisite for self-defense using deadly forcefear of great bodily harm can often also be expressed as the factual requisite for defense of dwelling, prevention of a felony assault or burglary."). The "meet force with force" language even though it comes from a standard instructionis misleading under the facts of this case, at least without an explanation of the two defenses. The giving of an instruction regarding the reasonable appearance of danger does not cure the error. Cf. Summers v. State, 672 So.2d 617, 618 (Fla. 5th DCA 1996) (finding fundamental error in a manslaughter case where the instruction on justifiable and excusable homicide was "incomplete in its failure to explain the alternative elements of excusable homicide"); Jones v. State, 666 So.2d *24 995, 998 (Fla. 5th DCA 1996) (finding that "the trial court's giving of an incomplete and inaccurate instruction on the law during jury instruction constitutes fundamental error where the error relates to an element of the offense"); Carter v. State, 469 So.2d 194, 196 (Fla. 2d DCA 1985) ("[W]here, as here, a trial judge gives an instruction that is an incorrect statement of the law and necessarily misleading to the jury, and the effect of that instruction is to negate the defendant's only defense, it is fundamental error and highly prejudicial to the defendant."); People v. Williams, 121 A.D.2d 145, 509 N.Y.S.2d 674, 677 (1986) (finding that court's stop-and-go reading of instructions resulted in "a disjointed rendition of the justification defense which must have confused the jury" and "the court made no meaningful effort to relate the law of justification to the facts of this case," leaving "jury essentially... to devise the law of self-defense solely from the court's halting recitation of the law, including some portions wholly irrelevant to the facts presented").
We also agree that the prosecutor's statements in closing argument compounded the instructional error. Quaggin specifically attacks the following comments:
The last major jury instruction that I would like to go over with you is the retreat aspect of the law that says if you're in your own home you don't have to retreat, but there are some parameters to this law. It is not carte blanche that if somebody comes to the door and you think they're committing whatever you can't just shoot them. If in the middle of the night I wake up and go downstairs, and I see a burglar and I have a gun in my hand and I say stop, and this person says, please don't shoot me, I give up, I don't have the right to say, well, too bad, Buddy, boom. And this is that law. If the defendant was attacked in his own home, or in his own premises, he had no duty to retreat and had the lawful right to stand his ground.
And then it says meet force with force. There has to be an equivalent act of force coming towards him before he can return force, but it goes even further, even to the extent of using force likely to cause death or great bodily harm if it was necessary. That's number one, to prevent death or great bodily harm to himself or the commission of a burglary of a dwelling. It would have to be necessary for him to use deadly force only if he thinks there is going to be harm for his building, his home is being burglarized.
(T 789-790). Quaggin argues that this statementlike the retreat instruction discussed aboveignores the affirmative defense of the use of deadly force to stop the commission of a burglary, which does not require that the homedweller face force before using force but rather allows such force when reasonably believed necessary. The State contends that the prosecutor's statement was accurate as to use of deadly force in the home because use of deadly force is not permissible to stop a burglary where such force is unnecessary. The State further argues that the "meet force with force" statement is accurate as to self-defense, which is what the prosecutor was talking about.
Although this statement was not objected to and thus was not preserved, we agree that it contributes to the error in the instructions, to which an objection was made. The prosecutor referred to "meeting force with force," which is not accurate as to defense of burglary. Contrary to the State's argument, the statement was not clearly confined to self-defense, but rather appears to relate to defense of burglary.
Finally, we address Quaggin's contention that the State misstated the burden of proof during closing argument when the prosecutor commented:
... The killing of a human being is justifiable homicide and lawful and then I focus on this word, if necessarily, if necessarily done while they are resisting an attempt to commit murder. Now, he *25 would have to necessarily believe that he was being murdered before he could use this, or commit a felony upon the defendant. There is no felony alleged that was committed upon him. No aggravated assault, no aggravated battery, or to commit a felony in any dwelling house in which the defendant was in at the time of the killing. That's where we come in with this burglary and theft. But keep in mind that theft requires intent. It requires intent beyond a reasonable doubt. You know, we would have evidence beyond a reasonable doubt that these kids were stealing. We don't have that.
(Emphasis added). Quaggin acknowledges that no objection was made to this comment, but he argues that it amounts to fundamental error and is therefore reviewable. Although only the statement quoted above is noted by Quaggin, the prosecutor made other remarks in this vein during closing argument, including the following:
They had also gone into that structure beyond Mr. Quaggin's structure, back near the trailers and had obtained, and keep in mind that the argument is burglary, okay. They had obtained the burglary of the comic books. This is the substance of the burglary, these home intruders take comic books from the structure, not the dwelling, not the structure where he's at, somewhere down the street. These home intruders take Coke-a-Cola [sic]. These home intruders, these thug like intruders, take Pez, the[y] pass up on beer. Pez, Coca-Cola, and comic books.
* * *
If, in order for you to believe that a burglary had been committed, keep in mind th[at] one of the elements of burglary is that the people had the intent to steal before they entered, before they entered they had to have the intent to steal. Now, that would constitute a theft, and then you combine that with breaking and entering, and theoretically, I guess, he says, technically, I guess this is a burglary.
Well, this will be the first case that I have ever heard where the stuff that was allegedly taken did not come from the structure where the burglary took place. No, this makes more sense. The evidence that's stolen from a different place is brought back to the owner's place by the thief. Does that make any sense at all? Or is that more consistent with the fact that they want to ask for the stuff? Does that make any sense at all?
* * *
It would have to be necessary for him to use deadly force only if he thinks there is going to be harm or his building, his home is being burglarized. But then again, it falls through the ground, burglary includes theft and theft includes intent and there is absolutely no evidence that these kids intended to steal.
(Emphasis added).
Quaggin is correct that in making these comments, the State misstated the necessary amount of proof. To the contrary of the State's assertions, the evidence need not have established beyond a reasonable doubt that the boys were committing burglary; rather, there had to be proof beyond a reasonable doubt that Quaggin's belief about whether a burglary was being committed and about the necessity of using deadly force was unreasonable. Cf. Mason v. State, 584 So.2d 165, 167 (Fla. 1st DCA 1991) ("[T]he modified instruction was misleading and confusing because it tended to shift the focus away from the issue of whether the defendant was justified in the use of force, and to place emphasis on whether the victim was justified in defending himselfa question which was not at issue in this case.") (emphasis in original). Florida law does not require a homeowner to determine, beyond a reasonable doubt, that the intruder is a burglar before using deadly force, and *26 in telling the jurors that in order for Quaggin to be justified in using deadly force the boys had to have the intent to commit a burglary and that no intent had been shown, the prosecutor repeatedly misstated the law. See Cave v. State, 476 So.2d 180, 186 (Fla.1985) ("Counsel may not contravene the law and the jury instructions in arguing to the jury."); Miller v. State, 712 So.2d 451, 453 (Fla. 2d DCA 1998) ("A defendant has a fundamental right to present a defense and to have the jury properly instructed on any legal defense supported by the evidence. These rights stand for naught if the prosecutor can ridicule a defense so presented, denigrate the accused for his temerity in raising the issue, and misstate the law in contradiction of the judge's instructions, as the prosecutor in this case did.") (citations omitted); Harvey v. State, 448 So.2d 578, 581 (Fla. 5th DCA 1984) ("The trial judge in this case should have corrected the misleading instruction. This instruction, the prosecutor's repeated misstatements of the law and the obvious jury confusion deprived Harvey of a fair trial so as to constitute fundamental error which requires reversal even in the absence of timely objections."); see also Eberhardt v. State, 550 So.2d 102 (Fla. 1st DCA 1989) (finding prosecutor's argument "highly improper" both because it misstated the law on the intoxication defense and appealed to jury's sympathy but not reaching the question of fundamental error due to reversal on other grounds); cf. Tuff v. State, 509 So.2d 953 (Fla. 4th DCA 1987) (reversing based on prosecutor's comments, finding fundamental error in remarks that suggested improper test of culpable negligence, attacked defense counsel, and were otherwise inflammatory). Additionally, we note that the jury was given instructions on burglary and theft which repeatedly refer to "intent" and "reasonable doubt" as to the commission of a burglary. These instructions compound the error in the prosecutor's closing argument.
Although Quaggin's attorney stated the contrary of the prosecutor's misstatements during rebuttal closing argument and the court did instruct the jury that Quaggin did not have to prove anything, these statements did not cure the error and cannot be said to have alleviated the jurors' confusion. Prior to the closing arguments, the judge told the jurors "that final arguments are not to be considered by you as evidence, but I would ask that you pay careful attention to what the attorneys are about to say, because I do believe that their arguments will help you better understand the evidence and the issues that you're going to be asked to resolve." However, the incorrect statements of law by the prosecutor, which were contradicted by the defense attorney, cannot be said to have helped the jurors understand the issues. Rather, the jury was told conflicting standards of what it had to find in order to conclude that Quaggin's actions were justified. Moreover, during deliberations, the jury submitted the following questions: "In terms of justifiable homicide, what constitutes a felony?" and "Is there a dollar amount as far as theft or burglary is concerned to constitute a felony?" The jurors' questions regarding dollar amount and burglary seem to indicate that the jury was unduly focusing on the boys' intentions rather than on the reasonable appearance that the boys created by their actions. Additionally, a tremendous amount of time at trial was devoted to presentation of evidence and argument regarding the purpose for the boys being on the property, further increasing the likelihood that the prosecutor's comments misled the jury regarding the materiality of the boys' intent to burglarize.
Although no objection was raised to these statements, we note that the instructional issue was preserved and find that the cumulative effect of all of the errors goes "to the very heart of the case" so as to constitute fundamental error. Knight v. State, 672 So.2d 590, 591 (Fla. 4th DCA 1996); see alsoFuller v. State, 540 So.2d *27 182, 184 n. 3 (Fla. 5th DCA 1989) ("Although the absence of an objection ordinarily precludes appellate review of an alleged error, we consider the cumulative effect of this error and others which will be discussed ... to be so fundamental as to require reversal.") (citations omitted).
REVERSED and REMANDED for a new trial.
W. SHARP, GOSHORN and GRIFFIN, JJ., concur.
NOTES
[1] Although we reverse on other grounds, we find no merit in Quaggin's argument that the State failed to present sufficient proof to rebut his belief that the use of deadly force was reasonably necessary to prevent the commission of a burglary. We agree with the State that the evidence was sufficient for submission to the jury regarding the defense of justifiable homicide. The witnesses gave differing accounts of the events prior to the shooting, and the issue of reasonableness was for the jury. Cf. Williams v. State, 674 So.2d 177, 178 (Fla. 2d DCA 1996) (finding that evidence of use of knife to end fight with unarmed victim "allowed the jury to reject the appellant's theory of self-defense"); Soberon v. State, 545 So.2d 490 (Fla. 3d DCA 1989) (finding evidence sufficient for submission to jury on second-degree murder charge where defendant shot unarmed victim four times).
[2] We reject the State's contention the argument on appeal is different from the argument below and that therefore this issue was not preserved.
[3] "The use of deadly force is justifiable when a person is resisting any attempt to murder such person or to commit any felony upon him or her or upon or in any dwelling house in which such person shall be." § 782.02, Fla. Stat. (1997). Additionally, a "person is justified in the use of deadly force only if he or she reasonably believes that such force is necessary to prevent imminent death or great bodily harm to himself or herself or another or to prevent the imminent commission of a forcible felony." § 776.012, Fla. Stat. (1997).